James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Harry JAFFE, Defendant.

Civ. A. No. 8545.

United States District Court, N. D. Alabama, S. D.

Nov. 21, 1957.

Stuart Rothman, Sol., Washington, D. C., Beverley R. Worrell, Regional Attorney, Norman H. Winston, Asst. Regional Attorney and John L. Britton, Attorney, Department of Labor, Birmingham, Ala., for plaintiff.

Rosenthal & Rosenthal and George S. Brown, Birmingham, Ala., for defendant.

LYNNE, Chief Judge.

By his complaint plaintiff seeks injunctive relief to restrain defendant from violating the minimum wage, overtime compensation, and record-keeping provisions of the Fair Labor Standards Act (29 U.S.C.A. § 215). Plaintiff contends that defendant's employees are engaged in commerce and in the production of goods for commerce within the coverage of the Act. On his part defendant denies that he is engaged in commerce and that his employees are engaged therein. Insofar as the claim relating to the production of goods for commerce is concerned, the defendant points to the language of 29 U.S.C.A. § 203(j) as affected by the 1949 amendment, and contends that such employees were not employed in any closely related process or occupation directly essential to the production of goods for commerce.

Defendant is engaged in Birmingham, Alabama, in the production, sale and distribution of used automobile and truck parts, tires and scrap metal. In the course of defendant's business, he purchases wrecked or burned late model automobiles which are brought to his yard by his employees. Defendant's employees remove from them salable parts, including generators, motors, etc. Used parts are removed from such automobiles by

defendant's employees shortly after their arrival on defendant's yard and are then sold immediately to a customer or stocked for sale. After such parts have been removed, the residue of the wrecked automobiles is classified as junk and regularly, at seven-day intervals, moved by defendant's employees to the yard of Jaffe-Wohl Iron and Metal. Company located on premises adjoining defendant's yard. During the year beginning July 1, 1955, through June 30, 1956, which defendant testified was a typical year in this respect, defendant sold something less than 100 tons of such scrap metal, which accounted for 1.67% of his total gross receipts.

The scrap metal from such cars is placed on or delivered to a common stock pile on the yard of Jaffe-Wohl Iron and Metal Company and, along with similar scrap, delivered to Jaffe-Wohl from other sources, is prepared by them for shipment as scrap metal. Producers located within the city of Birmingham regularly purchase scrap metal from Jaffe-Wohl Iron and Metal Company and use it as an ingredient in the manufacture of their products, substantial percentages of which are shipped outside the State of Alabama.

Altogether four employees are engaged in working on defendant's yard. Their duties largely consist in the stripping of parts from wrecked cars and trucks. In the typical week they remove parts from three or four cars and trucks. At the end of the week the scrap metal remaining after the stripping operations is carried over to the Jaffe-Wohl yard.

A night watchman is employed whose duties consist in watching the whole establishment, including the piles of motors and scrap.

In addition, a driver is employed whose duty it is to drive a wrecker to pick up the wrecked or burned automobiles and bring them to defendant's yard. With rare exceptions he secures the wrecked automobiles and trucks within the State of Alabama. He testified that for such purpose he has made only three trips to Tennessee in three years, two or three trips to Georgia, one trip to Florida, and three trips to Mississippi within the same period. When not engaged in driving the wrecker, he assists with the stripping of parts from the wrecked cars on defendant's yard.

Plaintiff introduced evidence tending to show that automobile parts, consisting largely of motors, were sold to persons having an address outside of the State of Alabama. There was no proof that any of the parts were ever transported by these persons with such addresses into other states. Indeed, there was no evidence from which it could be inferred that any of the parts sold by defendant entered the channels of interstate commerce.

With respect to the scrap metal sales of Jaffe-Wohl, the evidence disclosed that Republic Steel Corporation purchases between fifteen and thirty thousand tons per year from the pile of scrap metal on the Jaffe-Wohl yard. Republic melts down the scrap and refines it to produce steel. About 58% of Republic's sales are interstate in nature. Alabama Cast Iron Pipe Company purchases about 35,000 tons of scrap metal from Jaffe-Wohl per year. Such scrap metal is used by them in making cast iron pipe. 92.7% of such pipe are sold in interstate commerce. Connors Steel Corporation purchases about 67,000 tons of scrap metal per year from Jaffe-Wohl, melts it down to ingots, processes it into steel and sells about 63% in interstate commerce.

Aside from the fact that Jaffe-Wohl Iron and Metal Company was a regular and convenient customer to whom defendant disposed of his rather inconsiderable quantities of scrap metal, there was no connection, personal or economic, between defendant and such company. Situations may readily suggest themselves in which a contrary finding might be of controlling importance.

It is quite apparent from the testimony of defendant, in his own behalf, that he regards his business as a purely local operation. He testified that his real business is the sale of parts from wrecked, late model automobiles. He accepts no

mail orders; he does not ship any of such parts to customers in other states.

Conceding, as he must, that defendant's employees are not engaged in commerce and that the scrap metal, the residue of the wrecked automobiles and trucks from which the parts are removed, does not itself find its way into the channels of interstate commerce until after it has come to rest on the yard of and has been purchased by the customers of Jaffe-Wohl, it is plaintiff's position that since defendant's employees are constantly throughout the day engaged in duties resulting in the production of scrap metal used as an ingredient of the finished products that go out of the state, their duties bring them within the coverage of the Act.

In other words, plaintiff is here contending that in removing the salable parts from the wrecked automobiles and in producing the residue of the scrap metal, which in turn is moved once each week to adjoining premises of an unrelated business entity and placed on a stock pile of scrap metal from which customers purchase their supplies which, in turn, enters into their manufacturing processes and who, in turn, ship their finished products in the channels of interstate commerce, defendant's employees must be deemed to have been engaged in a process "directly essential" to the production of the finished goods of Jaffe-Wohl's customers which are shipped interstate.

The issue thus narrowed by concession and by failure of proof, defendant confidently insists that his employees are not engaged in any occupation that is "closely related" or "directly essential" to the production of goods for commerce by Alabama Cast Iron Pipe Company, Connors Steel or Republic Steel. What defendant is saying is that his employees and their duties are too far removed from the stream of interstate commerce to fall within the coverage of the Act. At best, defendant insists, the labors of his employees are remotely related or indirectly essential to the production of goods for commerce by Jaffe-Wohl's customers.

The issue thus joined, plaintiff relies upon the well-known cases of Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607; United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609; Mitchell v. Royal Baking Company, 5 Cir., 219 F.2d 532; Tilbury v. Rogers (Mitchell v. Tilbury), D.C., 123 F.Supp. 109, affirmed 5 Cir., 220 F.2d 757; Boisseau v. Mitchell, 5 Cir., 218 F.2d 734; Russell Co. v. McComb, 5 Cir., 187 F.2d 524; Ivey v. Foremost Dairies, D.C., 106 F.Supp. 793, affirmed 5 Cir., 204 F.2d 186, and Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 210 F.2d 427. In addition, plaintiff invites this court's attention to its own unreported decision in Tobin v. Magnetic Salvage, Inc., D.C., citing Bracey v. Luray, 4 Cir., 138 F.2d 8.

Defendant, after examination and analysis of the foregoing authorities, insists that plaintiff is not entitled to the relief for which he prays even under his own cases. Adverting to the indisputable proposition that the reach of the Congress under the Fair Labor Standards Act, far from exceeding, did not equal its grasp under the Interstate Commerce Clause of the Constitution, art. 1, § 8, cl. 3, defendant cites: Walling v. Jacksonville Paper Company, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Rolland v. United States, 5 Cir., 200 F.2d 678; Parham v. Austin Co., 5 Cir., 158 F.2d 566; 10 East 40th Street Building v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, and Rogers v. Glazer, D.C., 32 F.Supp. 990.

The main thrust of defendant's argument, however, is that, whatever might have been the state of the law prior to the 1949 amendment of 29 U.S.C.A. § 203 (j), it is now abundantly clear that the purely localized activities of defendant's employees are not covered by the Act.

No fair-minded person can read the legislative history relating to the amendment of Section 3(j) of the Act in 1949, as gleaned from the following numbered

pages of the 1949 Congressional Record, 11,001, 11,002, 11,111, 11,197, 11,198, 11,216, 11,217, 12,491, 14,880, 14,925, 14,928, 14,936, 14,937, 14,938, 14,940, 14,941, and 14,942, without realizing that the Congress was in rebellion against the apparent trend both in the courts and in the Wage and Hour Division of the Department of Labor to extend the coverage of the Act to purely local businesses and activities which the Congress had never intended to bring thereunder.

The Conference Report on the "Fair Labor Standards Amendments of 1949", U.S.Code Congressional Service, Volume 2, 81st Congress, First Session 1949, appearing at page 2251 and following, is revealing. Examples are given of cases in which the Administrator and the courts, both the Supreme Court and Courts of Appeal, had held the Act applicable. The conferees made it clear that under the Amendment to Section 3(j) neither the Administrator nor the courts would any longer be able to hold the Act applicable because the activities involved in such cases are not closely related or directly essential to production. Following the description of the examples referred to, the conferees inserted the following paragraph:

> "All such employees, as well as the employees of the merchant selling his goods locally and employees engaged in providing residential, eating, or other living facilities for factory workers, are quite clearly not performing any activities that are closely related or directly essential to the production of goods."

The Supreme Court of the United States has never had occasion to express an opinion as to the impact of the 1949 amendment of Section 3(j) of the Act on the pre-existing judicial and administrative concept of production although it was mentioned in passing in Maneja v. Waialua Agricultural Co., 349 U.S. 254, at page 271, 75 S.Ct. 719, at page 728, 99 L.Ed. 1040.

Without resort to reasoning by exaggerated examples or invidious analogies, the court is content to conclude that on the precise facts of this case, defendant's employees were not shown to have been engaged in performing any activities which were closely related or directly essential to the production of goods under Section 3(j) of the Act as amended in 1949. Judgment will be entered denying the relief for which plaintiff prays and dismissing this action with prejudice.