James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,

v.

Harry JAFFE, Appellee.

No. 17164.

United States Court of Appeals
Fifth Circuit.

Dec. 2, 1958.

Bessie Margolin, Office of the Solicitor, Dept. of Labor, Washington, D. C., Sylvia S. Ellison, Atty., Dept. of Labor, Washington, D. C., Stuart Rothman, Sol., United States Department of Labor, Washington, D. C., Beate Bloch, Atty., Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellant.

Albert A. Rosenthal, George S. Brown, Birmingham, Ala., for appellee. Rosenthal & Rosenthal, Birmingham, Ala., of counsel.

Before RIVES, BROWN and WISDOM, Circuit Judges.

BROWN, Circuit Judge.

The Secretary of Labor appeals from a denial of Section 17 injunctive relief, 29 U.S.C.A. § 217, in a case which Employer's counsel, in his strong advocacy, describes as "another example of the [Secretary's] persistent effort to bring all the local businesses of the nation under the Fair Labor Standards Act." Speaking for this Employer and all local businesses, he then sounds the awesome note: "If [this Employer] is subject to the Act then every local intrastate enterprise is covered."

These deeply disturbed feelings arise out of the Secretary's efforts to compel compliance in connection with the operation of the Employer's business carried on in Birmingham, Alabama, in the production, sale and distribution of used automobile and truck parts, tires and scrap metal obtained from wrecked automobiles.

It comes to us as a sterile question of law uninfected by factual controversy here or below, on findings which all accept and which we repeat verbatim or paraphrase without significant change.

In the course of his business, the Employer purchases wrecked or burned late model automobiles which are brought to his yard by his employees. His employees then remove from them such salable parts as generators and motors. Used parts are removed by his employees shortly after the arrival of the wrecks on the yard, and are then sold immediately to a customer or stocked for sale.[1] After

---

1. As brought and tried the complaint sought relief also on the ground that these motors and other spare parts were sold in substantial quantities to extra-state customers. The Secretary acquiesces in the District Court's adverse holding on this phase.

such parts have been removed, the residue of the wrecked automobiles is classified as junk and regularly, at seven-day intervals, moved by his employees to the yard of Jaffe-Wohl Iron and Metal Company[2] located on premises adjoining Employer's yard. During the year July 1, 1955, through June 30, 1956, which Employer testified was typical, something less than 100 tons of such scrap metal, the proceeds of which comprised but 1.67% of total gross receipts, was sold.

Four employees are engaged in working in the Employer's yard. Their duties largely consist in the stripping of parts from wrecked cars and trucks. In the typical week they remove parts from three or four cars and trucks. At the end of the week the scrap metal remaining after the stripping operation is carried over to the Jaffe-Wohl Iron and Metal Company yard. A driver is employed whose duty it is to drive a wrecker to pick up the wrecked or burned automobiles and bring them to Employer's yard. With rare exception these wrecked automobiles are picked up within the State of Alabama. When not engaged in driving the wrecker, he assists with the stripping of parts from the wrecked cars. A night watchman is employed whose duty it is to watch the whole establishment including the piles of motors and scrap.

The scrap metal going to make up the 100-ton annual delivery is placed on, or delivered to, a common stockpile on the yard of Jaffe-Wohl Iron and Metal Company. That scrap, along with similar scrap delivered to Jaffe-Wohl from other sources, is prepared by them for shipment as scrap metal. Producers located within the City of Birmingham regularly purchase scrap metal from Jaffe-Wohl Iron and Metal Company and use it as an ingredient in the manufacture of their products, substantial percentages of which are shipped outside the State of Alabama.[3]

In its successful defense below, two things were pressed hard by the Employer. First, the amount of scrap metal sold to Jaffe-Wohl was too insignificant; and second, the activities of the employees with respect to it were not " * * * in any closely related process or occupation directly essential to the production * * *" of the mill products as set forth in the 1949 Amendments to the Act.[4] The vigorous partisan statements by members of the Congress reflected in the history of these amendments may have cast a spell. The District Court seemed preoccupied with this

2. The two businesses are entirely distinct and separate in ownership and operation. There is a family relationship between the two Jaffes, but that is all.

3. The following table shows the amounts of scrap sold by Jaffe-Wohl to three large local mills, the end mill product, and percentage of interstate sales of each mill.

| Mill | Tons of Scrap Sold Annually by Jaffe-Wohl | Mill Product | Percent of Interstate Sale |
|------|------|------|------|
| Republic Steel Corporation | 15,000 to 30,000 | steel | 58% |
| Alabama Cast Iron Pipe Company | 35,000 | cast iron pipe | 92.7% |
| Connors Steel Corporation | 67,000 | ingots & steel | 63% |

4. 29 U.S.C.A. § 203(j) as amended by Pub.L. No. 393, 81st Cong., 1st Sess. c. 736, § 3, 63 Stat. 911 (1949). See 2 U.S.Code Cong.Service, p. 2251 (1949), and Wecht, Wage-Hour Law 327–55 (1951) for legislative history of 1949 amendments to F.L.S.A.

amendment to the definition of "produced." His conclusions rested entirely on the "closely related to directly essential" amendment.[5]

█ Without a doubt, we agree with the District Court that this 1949 Amendment represented a purposeful effort of Congress to prescribe a standard more restrictive than the former "necessary to the production" test. See note 4, *supra*, and Mitchell v. Moore, 8 Cir., 1957, 241 F.2d 249; Maneja v. Waialua Agricultural Co., 1955, 349 U.S. 254, 271, 75 S.Ct. 719, 728, 99 L.Ed. 1040, 1057, and Powell v. United States Cartridge Co., 1950, 339 U.S. 497, 499, 522, 70 S.Ct. 755, 768, 94 L.Ed. 1017, 1040 (dissenting opinion per Frankfurter, J.). But no matter how purposeful Congress was we should not become so transfixed by the nature and extent of these objectives that we are mesmerized into ignoring the plain terms of the Act which were not affected by the Amendments. For the fact is that except as to a single employee, the watchman, the 1949 Amendment has nothing to do with this case.

█ The Act applies to those engaged in the production of goods for commerce. The Act supplies its own definitions [6] for both "Goods" and "Produced." Clearly, this 100 tons of scrap metal comes within the literal definition of "goods." For while it is not the wares, product or commodity which is the subject of the eventual interstate movement, it most certainly is "any part or ingredient thereof." The three large mills, see note 3, *supra*, cannot produce their output of iron and steel products without scrap metal. It is "necessary," it is "indispensable," and as a practical matter it is an essential ingredient.

As the interstate mill product encompasses all of its ingredients as "goods," it is then a question whether the activities are a "production of goods." Here the test of Section 3(j), note 6, *supra*, is sweeping. It clarifies it if we separate it into its two major parts:

" * * * for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in

█ producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or

█ in any closely related process or occupation directly essential to the production thereof * * *."

All of the employees, save for the watchman, meet the initial portion [1].

5. Judge Lynne's Memorandum Opinion ended with this:

" * * * the court is content to conclude that on the precise facts of this case, defendant's employees were not shown to have been engaged in performing any activities which were closely related or directly essential to the production of goods under Section 3(j) of the Act as amended in 1949. * *."

Mitchell v. Jaffe, D.C.N.D.Ala.1957, 156 F.Supp. 596, 599.

6. "As used in this chapter—
    *      *      *      *      *

"(i) 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, *but does not include goods after their delivery into the actual physical possession of the ultimate consumer other than a producer, manufacturer, or processor thereof.*

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, *or in any closely related process or occupation directly essential to the production thereof,* in any State." (Emphasis supplied.) Fair Labor Standards Act, § 3 (1938), as amended (1949), 29 U.S.C.A. § 203. The portion italicized in Section 3(j) is the clause after the 1949 Amendment in lieu of the original clause which read: " * * * or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." 52 Stat. 1060 (1938).

The scrap results from stripping the wrecked car of usable and salable parts, burning or removing unusable portions, temporarily storing, stacking, and then moving and delivering the scrap remnants to Jaffe-Wohl's yard. This was handling in a very real sense. So, too, was it working on the goods. Each step from the receipt and handling of the auto wreck to the deposit of the scrap metal on Jaffe-Wohl's yard required the combined or separate work of these employees.[7] Everything done was with respect to the very "goods." They were producing goods for commerce.[8] There was no need to look at collateral activities not immediately associated with the goods to determine their relevance under [2].

To the established fact that the scrap moved to Jaffe-Wohl as a regular non-sporadic part of the Employer's general operation of its business is to be added the further crucial one that each of the employees performed substantial activities in connection with it. With that predicate it matters not that the annual

tonnage (100 tons) was slight, or that in dollars it was but 1.67% of the Employer's annual volume of sales.[9] This no more affects the outcome " * * * than does the predominate local intra-state business of an employer remove him from the Act as to those employees whose activities are interstate in nature." Mitchell v. Hodges Contracting Company, 5 Cir., 1956, 238 F.2d 380, 383.

■ Nor can the Employer attribute to the District Court from its action or memorandum a purpose of holding that there was insufficient proof that any of the Employer's scrap went into any of the percentage of mill products which moved interstate, note 3, *supra*. The District Court did not say so nor could it have done so. Any such notion of tracing piece by piece, scrap by scrap, has long been rejected both here and elsewhere. The question is whether, had the Employer used the knowledge or the reasonable teachings of knowledge, he would have realized that the goods would enter the stream of commerce.[10] One selling scrap to a yard next door from

7. "But the statute, while defining 'produced' to mean 'handled' or 'worked on', has not defined 'handled' or 'worked on.' These are terms of ordinary speech and mean what they mean in ordinary intercourse in this context. They serve a useful purpose when read to relate to all steps, whether manufacture or not, which lead to readiness for putting goods into the stream of commerce. One who packages a product, or bottles a liquid, or labels, or performs any number of tasks incidental to preparing for shipment might otherwise escape the Act, for in a sense he neither manufactures, produces, or mines the goods. We are clear that 'handled' or 'worked on' includes every kind of incidental operation preparatory to putting goods into the stream of commerce." Western Union Telegraph Co. v. Lenroot, 1944, 323 U.S. 490, 503, 65 S.Ct. 335, 342, 89 L.Ed. 414, 424.

8. Tilbury v. Mitchell, 5 Cir., 1955, 220 F. 2d 757, affirming sub nom. Tilbury v. Rogers, D.C.W.D.La.1954, 123 F.Supp. 109, certiorari denied 1955, 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748 (0.216 of 1% of total dollar volume); Mitchell v. Royal Baking Co., 5 Cir., 1955, 219 F.2d 532 (1.32% of total production); Bracey

v. Luray, 4 Cir., 1943, 138 F.2d 8; Walling v. W. D. Haden Co., 5 Cir., 1946, 153 F.2d 196, 198, certiorari denied 328 U.S. 866, 66 S.Ct. 1373, 90 L.Ed. 1636.

9. Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Mabee v. White Plains Publishing Co., 1946, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607; Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 1954, 210 F. 2d 427, certiorari denied Stewart-Jordan Distributing Company, Inc. v. Mitchell, 1954, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136; North Shore Corp. v. Barnett, 5 Cir., 1944, 143 F.2d 172, 175, citing with approval Schmidt v. Peoples Telephone Union of Maryville, Mo., 8 Cir., 1943, 138 F.2d 13, 15; Foremost Dairies, Inc. v. Ivey, 5 Cir., 1953, 204 F.2d 186; Mitchell v. Royal Baking Co., 5 Cir., 1955, 219 F.2d 532, 534.

10. Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186; Tobin v. Celery City Printing Co., 5 Cir., 1952, 197 F.2d 228; Schulte, Inc. v. Gangi, 1946, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114; Warren-Bradshaw Drilling Co. v. Hall, 1942, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, affirming 5 Cir., 1941, 124 F.2d 42; Southern Advance Bag & Paper Co. v. United States,

which over one hundred thousand tons moved to the insatiable furnaces of the nearby mills in this southern steel center could not claim an ignorance that his scrap would find its way into this continuous flow. The District Court did not say or intimate otherwise. All that the Court held was that, granting that this hundred tons moved into the scrap stockpile of these three mills and thence into iron or steel products which moved in interstate commerce, the activity of these employees was not "closely related" or "directly essential" to the production of that steel or iron by these mills.

■ But when it comes to the watchman quite a different problem is presented. This is so even though the scrap is fixed as "goods." Coverage here depends on [2], which brings directly into play the restrictive Congressional purpose reflected by the 1949 Amendments. To be sure, a watchman may qualify as one whose work is a " * * * closely related process or occupation directly essential to the production" of goods. When Courts have found that to be so in fact, or where the facts would admit of no other legal conclusion, watchmen have been held to be covered.[11]

Here the District Judge did not find that this particular watchman's work was so closely related. All he found was that "a night watchman is employed whose duties consist in watching the whole establishment, including the piles of motors and scrap." But this was not a finding that such work had the statutory essentiality. Indeed, on that score, his finding, see note 5, *supra*, was an emphatic one that the employees " * * *

were not shown to have been engaged in performing any activities which were closely related or directly essential to the production of goods * * *." [156 F. Supp. 599.] While we have pointed out that as to the other "handling" employees that finding was of no consequence, it is not robbed of its vitality in a sphere in which admittedly it is the relevant standard. Before we may disregard it we must jump the clearly erroneous hurdle of Fed.R.Civ.P. 52(a), 28 U.S. C.A. The facts of this record will not permit this.

When it is borne in mind that it is only the resultant nonusable scrap remaining after the stripping of salable parts which becomes the "goods," the Court was not absolutely bound to hold that the watchman was either really needed or served any substantial purpose in watching such scrap. Implicit in the contrary finding of the Judge was the permissible inference that, once the valuable spare and salable parts are disregarded, what was left or would be left, was of such little value in dollars, and of such size, weight, shape and physical characteristics that the production of goods (the products of steel and iron mills) would not be thwarted were they left unguarded.

As this basic finding is not shown to be clearly erroneous, we cannot reverse the Court's holding as to the watchman. As to the watchman the case is affirmed, but as to the other employees it is reversed and remanded for further and not inconsistent proceedings.

Affirmed in part and reversed and remanded in part.

---

5 Cir., 1943, 133 F.2d 449; Fleming v. Enterprise Box Co., D.C.S.D.Fla., 1941, 37 F.Supp. 331, affirmed, 5 Cir., 1942, 125 F.2d 897, certiorari denied Enterprise Box Co. v. Holland, 1942, 316 U.S. 704, 62 S.Ct. 1312, 86 L.Ed. 1772; United States v. Darby, 1941, 312 U.S. 100, 118, 61 S.Ct. 451, 85 L.Ed. 609.

11. See, e. g., Mitchell v. Joyce Agency, Inc., 1955, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740, reversing, 7 Cir., 1954, 211 F.2d 241, affirming, sub. nom. Durkin v. Joyce Agency, Inc., D.C.N.D.Ill.1953, 110 F.Supp. 918; Russell Co. v. McComb, 5

Cir., 1951, 187 F.2d 524; Mitchell v. Strickland Transportation Co., 5 Cir., 1955, 228 F.2d 124, 127. See also Wecht, Wage-Hour Law 307, n. 962 (1951). In view of this considerable body of law we think that Rogers v. Glazer, D.C.W.D.Mo.1940, 32 F.Supp. 990, so heavily relied on by Employer, must now be looked upon as a case of "another vintage," Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 429, 434, 75 S.Ct. 860, 861, 864, 99 L.Ed. 1196, 1200, so that as a precedent it has little, if any, vitality.