**Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor**

v.

**MODERN TRASHMOVAL, INC., a corporation, and Francis P. E. Bohager, individually.**

**Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor**

v.

**MODERN TRASHMOVAL, INC., a corporation (two cases).**

**Civ. A. Nos. 13316, 13420, 13529.**

United States District Court
D. Maryland.
July 13, 1962.

Charles Donahue, Sol., Ernest N. Votaw, Regional Attorney, Leo L. Holstein, Deputy Regional Attorney, Morton I. Schwartzman, Associate Attorney, U. S. Dept. of Labor, for plaintiff.

Charles G. Page, Baltimore, Md., for defendants.

R. DORSEY WATKINS, District Judge.

These three actions instituted by the Secretary of Labor under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., (the "Act") were consolidated and heard together. Civil Action No. 13316 is an action under 29 U.S.C.A. § 217 for an injunction against alleged violation of overtime and record keeping requirements of the Act. Civil Action No. 13420 and Civil Action No. 13529 are wage suits brought under 29 U.S.C.A. § 216(c) at the written request of nineteen employees, to recover alleged underpayment of wages. The Secretary relies upon Mitchell v. Dooley Bros., Inc., 1 Cir.1960, 286 F.2d 40, as having finally settled the issue of law in the latter two suits herein.

### Background Facts

The individual defendant is the president, chief executive officer, and majority stockholder of the corporate defendant.

Defendants operate a business of collecting and disposing of garbage, rubbish, debris and industrial waste, collected almost wholly from business and industrial establishments, many of which establishments are engaged in interstate commerce or in the production of goods for interstate commerce. Defendants also make collections from the individual units of one large and several small apartment houses, under contracts with the apartment house owners or operators, not with the individual tenants. In addition, a few relatively minor calls are made on a non-recurring basis (cleanup after a fire, or major repair jobs).

With a single exception later to be noted, the material collected is either destroyed by incineration, or dumped, within the State of Maryland.

Collections are made from containers at loading platforms, elevator landings, other places adjacent to working areas; and in some, but relatively few, instances containers are removed from inside buildings.

The investigation out of which these suits arose covered the period April 1, 1959 to March 29, 1961. Within this period defendants entered into a union contract effective September 20, 1960. Prior to and during the first six weeks of the union contract, no records were kept of hours worked. Since November 2, 1960, a time-clock card record has been kept for each driver and helper. Defendants contend that the elapsed time shown on these cards is inaccurate and too high, because of the practice of employees clocking in before the assigned starting times; clocking in before being ready for work; waiting for driver or helper after clocking in, etc.

On conflicting evidence, the court finds that the employees in question worked fluctuating numbers of hours a week, ranging generally from fifty-one to fifty-seven hours. Throughout the period in question they were paid fixed weekly wages. Prior to November 2, 1960 no overtime wages were paid as such, although occasionally employees would be paid additional sums for special jobs, the amounts paid bearing no direct relation to the length of the special job, or the hours otherwise worked. Since November 2, 1960, employees have received overtime payment for hours in excess of fifty-six or sixty (in accordance with the provisions of the union contract relating to the type of work being

done), but such overtime payment is not at the rates required by the Fair Labor Standards Act, if that Act is applicable.[1]

The parties have, however, stipulated on the hours to be used for the purpose of calculating the amounts, if any due the individual employees.[2]

## Questions Presented

1. Were the employees engaged in interstate commerce?

2. Were the employees engaged in the production of goods for commerce, or in a closely related occupation directly essential to the production thereof?

3. Is the corporate defendant an exempt "retail or service establishment"?

## Preliminary Considerations

■ Concededly, the applicability vel non of the Act is dependent on the character of the employee's work, not the business of the employer. Kirschbaum v. Walling, 1942, 316 U.S. 517, 524, 62 S.Ct. 1116, 86 L.Ed. 1638; McLeod v. Threlkeld, 1943, 319 U.S. 491, 497, 63 S.Ct. 1248, 87 L.Ed. 1538; Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 571–572, 63 S.Ct. 332, 87 L.Ed. 460; Schroepfer v. A. S. Abell Co., Inc., 4 Cir.1943, 138 F.2d 111, 113, cert. den. 1944, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060, reh. den. 1944, 322 U.S. 770, 64 S.Ct. 1149, 88 L.Ed. 1595.

Moreover, in enacting the Act, Congress did not seek to legislate to the full extent of its constitutional power, but left to the States a domain for regulation, Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 314, 80 S.Ct. 739, 4 L.Ed.2d 753; Kirschbaum v. Walling, 1942, 316 U.S. 517, 521–523, 62 S.Ct. 1116, 86 L. Ed. 1638. Also, the Supreme Court has recognized the interplay of national and local concern in different aspects of commerce. In Mitchell v. H. B. Zachry Co.,

1960, 362 U.S. 310, 315–316, 80 S.Ct. 739, 4 L.Ed.2d 753, the court said:

"* * * In Kirschbaum Co. v. Walling, supra, we found that limits on coverage cannot be understood merely in terms of the social purposes of the Act, in light of which any limitations must appear inconsistent. For the Act also manifests the competing concern of Congress to avoid undue displacement of state regulation of activities of a dominantly local character. Accommodation of these interests was sought by the device of confinement of coverage to employment in activities of traditionally national concern. The focus of coverage became 'commerce,' not in the broadest constitutional sense, but in the limited sense of § 3(b) of the statute: 'trade, commerce, transportation, transmission, or communication among the several States * * *.' Employment 'in' such activities is least affected by local interests. A step removed from employment 'in commerce' is employment 'in' production which is 'for' commerce. Under this clause we have sustained coverage whether the product is to be consumed primarily by commerce in the statutory sense, by its 'facilities and instrumentalities,' see Alstate Construction Co. v. Durkin, 345 U.S. 13, [73 S.Ct. 565, 97 L.Ed. 745] or, as in the case of the products of the industrial consumers of water here, to move in it. Furtherest removed from 'commerce' is employment not 'in' production 'for' commerce but in an action which is only 'related' to such production. In applying this provision, we have necessarily borne in mind that it is furtherest removed in the scheme of the statute from the hub of the na-

---

1. Defendants do not seriously contend that if their employees are covered by the Act, the payments before or after the signing of the union contract would fall within the exceptions of 29 U.S.C.A. § 207(e) or Walling etc., v. Belo Corp., 1942, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716.

2. The stipulation represents a substantial concession by the Government over what a highly technical approach might have produced; and in applicable cases applies the two-year statute of limitations.

tional interest in 'commerce' upon which a limited displacement of state power is predicated."

Counsel seem in general agreement that the Supreme Court cases most nearly in point with the problem here presented are Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Borden Co. v. Borella, 1945, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865, and 10 East 40th St. Co. v. Callus, 1945, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806.[3]

Kirschbaum held that the jobs of building-maintenance employees, ranging in responsibility from electricians to porters, of a loft building locally owned, but tenanted by producers for commerce who had installed therein and used production facilities, had such a close and immediate tie with the process of production for commerce that they were such an essential part thereof that the employees' occupations were "necessary" to production.

In Borella, maintenance employees of a producer-owned office building occupied in part by the owner-producer's central offices, but in which it maintained no production facilities, were held to be engaged in an occupation "necessary to the production of goods" for interstate commerce, and within the coverage of the Act.

In Callus, maintenance employees of a locally-owned office building, held out for general tenancy, and in fact tenanted by a miscellany of tenants, some of whom produced goods for interstate commerce, were held not to be covered. Although the employee duties were substantially identical with those in Kirschbaum and Borella, they were "distinguished" on the basis that they were part of an enterprise which "spontaneously satisfies the common understanding of what is local business."

The Supreme Court has clearly recognized that the borderlines between coverage and non-coverage are not well defined. In Kirschbaum, the court said (316 U.S. at page 523, 62 S.Ct. at page 1120):

"* * * [T]he Fair Labor Standards Act puts upon the courts the independent responsibility of applying ad hoc the general terms of the statute to an infinite variety of complicated industrial situations. Our problem is, of course, one of drawing lines. But it is not all a problem of mensuration. There are no fixed points, though lines are to be drawn. The real question is how the lines are to be drawn—what are the relevant considerations in placing the line here rather than there. * * *"

The Secretary, quite understandably, heavily relies upon Mitchell v. Dooley Bros., Inc., 1 Cir. 1960, 286 F.2d 40, as a Court of Appeals decision establishing the right to sue on behalf of defendants' employees, and supporting the Secretary's claim for an injunction. In that case the District Court had granted summary judgment in favor of the defendant. In reversing, the Court of Appeals stated that the only question was whether the employees in question were "engaged in the production of goods for commerce", finding it unnecessary to decide whether or not the employees were also "engaged in commerce" (286 F.2d 41, and footnote 1).

In Dooley, the Court of Appeals found that defendant was an independent contractor, some of whose employees removed rubbish, garbage and ashes from concerns and federal agencies which were engaged in commerce or in the production of goods for commerce, as well as from local commercial firms and private dwellings. The materials to be collected

---

3. These cases were decided before 1949, when the law required that to be included an activity not "in" production must have been "necessary" to it. Under the 1949 amendment, "necessary" has been changed to "directly essential." It is recognized that this was intended to narrow the coverage of the Act although this judge would have been inclined to think the choice of words inept and inapt.

were placed in barrels by the customers, which barrels ordinarily were picked up on the sidewalk by defendant's employees and placed in its truck, although on special request defendant's employees would enter buildings and pick up collections from elevators and loading platforms. The material collected was not moved in interstate commerce after its collection. Collections were made according to contract, three times a week, or daily, and customers considered collections, because of the nature of the refuse, to be essential to the carrying on of their business, because of lack of space, fire hazards, or health problems.

The Court of Appeals apparently received little, if any, help from the legislative history leading to the 1949 amendment of the Act, under which the previous test of engaging in the production of goods—employment "in any process or occupation necessary to the production thereof"—was changed to employment in "any closely related process or occupation directly essential to the production" thereof. The court considered that the purpose of the amendment was "to limit peripheral definitions adopted by some courts, but in the main it was a nod of approval" (286 F.2d 42) and observed that the Congressional estimate was that less than one per cent of previously covered workers would be affected. (286 F.2d 43, footnote 3).

The Court of Appeals pointed out that service to some local businesses and private houses did not deprive employees of coverage; as little as 3.3% of customers' activities in interstate activities had been held sufficient for coverage prior to the amendment. The court failed to see the relevance of the fact that the type of service rendered by defendant's employees (as by defendants' employees herein) [4] was frequently performed by municipal employees; and that a layman would not think of a rubbish collector as being in an occupation related to producing goods. The Court of Appeals concluded that "the removal of the debris seems as closely related as it does essential" to the production of goods of commerce. (286 F.2d 44).[5]

Counsel for defendants challenge the validity and applicability of Dooley vigorously, to the point that its hurt is emphasized.[6] Reference is made to the fact that the Court of Appeals found that employees of defendant spent one-fourth to one-third of their time making collections from establishments "engaged in commerce or in the production of goods for commerce", and it is argued therefrom that the court apparently did not recognize or appreciate the distinction between employees engaging in the production of goods for commerce, and being engaged in commerce. As pointed out herein, the Court of Appeals found it unnecessary to consider this difficult distinction, as it placed its decision upon the ground that the employees in question were engaged in the production of goods for commerce within the Act.

Defendants' counsel also refer to the "amazing" fact that the First Circuit Court of Appeals did not refer to Callus, supra.[7] This omission is at least as consistent with the interpretation that that Court did not consider this decision relevant, as with the conclusion that the court was unaware of the Callus decision,

4. The testimony in this case was that the City of Baltimore would, to a very moderate extent, perform as a tax service, the work done by defendants; but any excess was a matter of contract between the taxpayer and a private concern, such as defendants.

5. At the argument in this case, the attorney for the Secretary stated that on remand, an injunction was granted in Dooley. Counsel for defendants did not challenge this statement.

6. "Methinks thou protesteth too much." Had the lady not had a red nose, she would not have resented the allegation thereof so vigorously.

7. At least equally "amazing" is the failure of the District Court to rely upon Callus if it has nearly the significance that defendants assert. Phillips v. U. S., D.C. Mass.1960, 181 F.Supp. 312.

and had it been advised thereof, would have decided differently.

Lastly, defendants contend that the question of whether Dooley was entitled to exemption as a retail establishment under 29 U.S.C.A. § 213(a) (2) "was not even raised in the case in the opinion of upper or lower court." [8] Here, again, this may mean that plaintiff, or defendant, either or both, did not think such an argument sufficiently tenable to raise the point, or to feel it necessary to offer anticipatory rebuttal.

With this background, the court will endeavor to determine how "the lines are to be drawn", without "fixed points", and why they should be placed "here rather than there" (Kirschbaum, supra, 316 U.S. at 523, 62 S.Ct. at page 1120).

■ 1. Were defendants' employees engaged in commerce?

The Secretary contends that insofar as the removal of trash from establishments engaged "in commerce" is concerned, coverage depends upon whether the work is so directly and vitally related to the "in commerce" activities of such establishments as in practical effect to be a part of it. Mitchell v. C. W. Vollmer & Co., Inc., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Mitchell v. Lublin, McGaughy & Associates, 1959, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243; Telephone Answering Service v. Goldberg, 1 Cir. 1961, 290 F.2d 529. As to the "practical test" see Overstreet v. North Shore Corp., 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Republic Pictures Corporation v. Kappler, 8 Cir. 1945, 151 F.2d 543, 162 A.L.R. 228.

The testimony more particularly considered in connection with point 2(b), infra, might well indicate that failure to remove trash, refuse and debris from the premises of establishments "in commerce" would "impede or abate" interstate commerce. Significant as this is on the question of violations by defendants of 29 U.S.C.A. §§ 206 and 207 there was no proof or stipulation as to what employees were engaged, or during what period or periods, in collections from such establishments. The employees of defendants on whose behalf suits have been brought are accordingly not entitled to recover on this aspect of the case.

2. Were defendants' employees engaged in the production of goods for interstate commerce?

■ (a) Through the delivery of goods to be used in the production of goods for commerce.

Throughout the period involved in these proceedings, defendants in certain instances were able to have customers separate cardboard and waste paper from other trash. In these instances such cardboard and waste paper were separately collected and sold to Frank P. R. Bohager & Sons, a firm founded by the father of the individual defendant, and in which the individual defendant formerly had a significant interest. Sales and deliveries of such salvaged cardboard and paper were made by defendants during each month of the two-year period in question. Cardboard and paper were in turn purchased in Maryland by a carton manufacturer from Frank P. R. Bohager & Sons during the same period and commingled with other such cardboard and paper and manufactured into a new product—cartons— which were shipped by the manufacturer interstate. Such activity by defendants would seem, and if necessary the court would hold, to be, the production of goods for interstate commerce within the meaning of the Act, Bracey v. Luray, 4 Cir. 1943, 138 F.2d 8; Mitchell v. Jaffe, 5 Cir. 1958, 261 F.2d 883; despite its small relation to total annual dollar volume, there apparently being no de minimis limitation as to coverage. Mabee et al. v. White Plains Publishing Co., Inc. 1946, 327 U.S. 178, 66 S.Ct. 511, 90 L. Ed. 607.[9]

---

8. Defendants brief, page 5.

9. Less than one-half of one percent. The court does not consider McLeod v. Threl-

keld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, apposite in this connection.

The court finds that these collections and sales of waste cardboard and paper have now been discontinued, and that there is no present intention on the part of defendants to resume such collections for purposes of resale, and to make resales. This does not alter the fact of violation by defendants of 29 U.S.C.A. §§ 206 and 207, but is relevant on the question of injunction.

However, there was no proof or stipulation as to what employees were engaged in such collection and delivery for resale at any time or times. The Secretary has therefore failed to prove that any employees as distinguished from their employer, were thus engaged in interstate commerce in such transactions. The employees on whose behalf suits have been brought are not entitled to recover on this aspect of the case.

■ (b) As being engaged in work "closely related" and "directly essential" to production of goods for commerce.

29 U.S.C.A. § 203(j) as amended in 1949, reads as follows:

"'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in *any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."* (Emphasis added).

The 1949 amendments substituted the emphasized phrase for the phrase "or in any process or occupation necessary to the production thereof."

All decisions and comments seem to conclude that the effect of the 1949 amendment was to narrow (although to what extent may be disputable) the coverage of the Act. Fortunately [10] any interpretation of either phrase leads, in this case, to the same result.

It was [11] stipulated that each employee, on whose behalf suit has been brought, at least once during each week in question [April 1, 1959 to March 29, 1961] collected debris from at least one customer who was at such times engaged in the production of goods for commerce. The question therefore is whether such employee activities were in a "closely related process or occupation directly essential to the production" of goods for commerce. The court is satisfied that the evidence establishes that the employees in question were so engaged. In considering the 1949 amendments, the House report stated that:

"* * * the proposed changes are not intended to remove from the act *maintenance, custodial, and clerical employees* of manufacturers, mining companies and other producers of goods for commerce. *Employees engaged in such maintenance, custodial, and clerical work will remain subject to the act, notwithstanding they are employed by an independent employer performing such work on behalf of the manufacturer, mining company or other producer for commerce.* All such employees perform activities that are closely related and directly essential to the production of goods for commerce." (95 Cong.Rec. 14928–29, emphasis added).

Likewise, the Senate Report stated:

"Typical of the classes of employees whose work is closely related and directly essential to production, within the meaning of Section 3(j) as amended by the conference agreement, are the following employees performing tasks necessary to effective productive operations of the producer:

* * * * * *

"2. Employees repairing, maintaining, improving, or enlarging the

---

10. If the court is correct.

11. After much travail, and many vacillations by defendants.

buildings, equipment of facilities of producers of goods. Roland Electrical Co. v. Walling (326 U.S. 657 [66 S.Ct. 413, 90 L.Ed. 383]); Kirschbaum v. Walling (316 U.S. 517 [62 S.Ct. 1116, 86 L.Ed. 1638]); Bordon Co. v. Borella (325 U.S. 679 [65 S.Ct. 1223, 89 L.Ed. 1865]); Walling v. McCrady Construction Co. (156 F.2d 932 (C.A.3)); Walling v. Mid-Continent Pipe Line Co. (143 F.2d 308 (C.A.10)); Bowie v. Gonzales (117 F.2d 11 (C.A.1)); Bozant v. Bank of New York (156 F.2d 757 (C.A.2)).

"3. Plant guards, watchmen, and other employees performing protective or custodial services for producers of goods. Walton v. Southern Package Corp. (320 U.S. 540 [64 S.Ct. 320, 88 L.Ed. 298]); Wantock v. Armour & Co., (323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118); Walling v. Sondock (132 F.(2d) 77 (C.A.5)); Engebretson v. [E. J.] Albrecht (150 F.(2d) 602 (C.A.7)); Slover v. Wathen (140 F.(2d) 258 (C.A. 4)); Shepler v. Crucible Steel Co. (140 F.(2d) 371 (C.A.3)); Walling v. Thompson (65 F.Supp. 686 (D.C. Calif.)).

"The work of such employees, is, as a rule, closely related and directly essential to production *whether they are employed by the producer of goods or by someone else* who has undertaken the performance of particular tasks for the producer." (95 Cong.Rec. 14875; emphasis supplied).

It is not necessary, for a conclusion of coverage, to accept the Secretary's argument that employees of garbage collection are analogous to employees of a utility.[12] The direct relationship of the trash removal activities in this case to the production of goods was clearly demonstrated by the evidence.

Fred Harrison, a warehouse supervisor for Food Fair, testified that there were six containers owned by Modern, of which all or some were of 6 cubic yards capacity each, and that they were kept at the warehouse adjacent to the loading and receiving platforms at which goods are received and shipped daily in interstate commerce. The warehouse serves Delaware, Virginia, Pennsylvania, District of Columbia, and Maryland.

Trash consists of food refuse such as produce spillage and spoilage, breakage, paper cartons, containers, etc., which is carried by Food Fair employees from working areas to the six containers at the loading and receiving platforms, where it is collected by Modern employees twice daily during the summer and once daily during the remainder of the year.

Harrison's testimony was that daily collection of the garbage, food spoilage, paper, etc. was necessitated not only by space limitations which would cause overflow on the platforms and stop work, but also because of strict health requirements.

Testimony to the same effect was given by Frank L. Shafer, Assistant Manager of the International Harvester Co. which, at its Washington Boulevard plant, is engaged in receiving from adjoining states machines manufactured by Internation-

12. Garbage collection companies have not, at least to the present, had the powers of eminent domain or benefit of monopoly, accorded to the ordinary public utility; nor have their rates and services been subject to control and regulation by Public Service or Public Utility Commissions.

In a broad sense the function performed by garbage collectors is utile, useful, a "utility." So are the functions of many ordinary businesses.

Nor is the fact that municipalities belatedly perform some garbage collection services controlling. As already indicated, the City of Baltimore to a limited degree provides for garbage and refuse collection. Neither the City nor the public is interested in the instrumentality by which the excess is removed; by one of several private companies; or by the producer of the waste, itself. To call a private manufacturer, who destroys its own waste (as McCormick & Co. largely does) a "utility" in that respect would be an unlikely and tortuous construction.

al, repairing and servicing them, and shipping them, as well as new parts, to a seven state area. Four containers owned by Modern of 2 cubic yards capacity each are kept on the premises. Cardboard and paper trash are stored on the receiving dock and removed daily by Modern. Shafer testified that failure to remove the trash would soon interfere with and stop receipt of goods, in addition to creating a sanitation and fire hazard.

Robert Redding, Receiving Supervisor of the Bremner Biscuit Company, testified that his company bakes cookies and crackers which are shipped over the entire United States, and receives regularly goods from other states; that trash consisting of food refuse (cookie and cracker rejects, residue, etc.) and wrappings are kept in the receiving department on the first floor; that the firm has no facilities to store trash for more than one day and that it is therefore picked up daily (five days a week) by Modern; that failure to do so would hamper receiving and shipping room operations as well as create serious problems of odor and sanitation.

Robert E. Large, Warehouse Superintendent of the Pittsburgh Plate Glass Co., testified that wood trash is stored on a loading platform and that failure to remove it would interfere with receipt and shipment and would cause working and fire hazards in the plate glass department.

W. P. Reisinger, Building Superintendent of McCormick & Company, a company engaged in the importation of goods from foreign countries, and which ships all over the United States and to foreign countries, testified that for the most part his company disposed of waste in its own incinerator, but that incombustible material and certain other wastes were discharged into defendants' receptacles, five large size containers, collected regularly two to three times a week, and that if and when his company's incinerator was shut down, as it was at regular intervals, and also when repairs were necessary, defendants would have to haul away "everything"; that his company, with its exceptionally high standards of cleanliness, could not continue production if it could not at once dispose of rubbish.

William C. Deale, Sanitary Engineer of the Ward Baking Company testified that the six large containers of the corporate defendant (of two cubic yard capacity each, representing a total capacity of 240 garbage cans of 20 gallons each) were emptied daily by it. He explained further that the containers were on wheels; that they were moved to the actual production areas by Ward employees, where the trash residue of bread and cake baking, icing, etc. was put into them by Ward employees; and that they were then wheeled back by Ward employees to the areas where the corporate defendant's employees emptied them. If they were not emptied, there would be an interference with production; blow flies, fruit flies and gnats would congregate; there would be trouble with the Army, for which goods are produced, the Food & Drug Administration, and the City and State Health Departments. The "closely related" aspect of trash removal to production is clearly demonstrated where the employees of the producer (Ward) clear their working areas for further production and their removal activities are then continued by the corporate defendant's employees. Defendants' employees really continue and complete the work of Ward's employees in this respect.

The court accordingly finds as a fact, and concludes as a matter of law, that defendants' employees were, at the times in question, engaged in work "closely related" and "directly essential" to the production of goods for commerce.

■ 3. Is the corporate defendant an exempt retail or service establishment?

Section 13(a) (2) (29 U.S.C.A. 213) of the Act reads as follows:

Section 13(a) "The provisions of Sections 6 and 7 shall not apply with respect to * * *

"(2) Any employee employed by any retail or service establishment,

more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; * * *."

Section 13 of the Act was amended by the "Fair Labor Standards Amendment of 1961" (Public Law 87–30; 87th Congress H.R. 3935; effective May 5, 1961). The amendments to Section 13 became themselves effective on September 3, 1961. However, they do not affect the above quoted provisions of the law except with regard to establishments which have more than $1,000,000 volume of sales. Inasmuch as the gross sales of the corporate defendant are far below that figure, for the purposes of this suit Section 13(a) (2) is not affected by the amendments.

With respect to the three elements essential for exemption, it is clear that more than 50 per cent of the corporate defendant's annual dollar volume of sales is made within Maryland, and more than 75 per cent of its annual dollar volume of sales is not for resale. The remaining question is whether or not, within the meaning of the Act, the sales by the corporate defendant are "recognized as retail sales or services in the particular industry * * *."

If this language is to be taken literally, and each industry is its own independent lexicographer, the court would be required to find the corporate defendant to be an exempt establishment. Written interrogatories addressed respectively to officers of scavenger services in Illinois and Georgia, and the answers thereto, were offered in evidence and admitted without objection. Each one expressed the personal opinion that services similar to those performed by the corporate defendant were retail services, and were so regarded in the trash removal industry.[13]

13. The reason for the personal opinion of Dean Buntrock, manager of one trash removal company, secretary-treasury of a second, president of a third, and a member of the local and national trash removal associations, was stated as follows:
"My answer is 'yes,' and my reason for this is that the service is open to everyone, or the entire public. The material collected is not sold or reused, but it is disposed of or destroyed. The customer cannot resell or sublease the service or the articles that are picked up. The service is given directly to the customer, because the service is on a regular and frequent basis with most of the charges being relatively small per unit, and in most cases the quantity of material removed also being relatively small."
George H. McWhirter, Jr., president of a trash removal company in Atlanta, Ga., and president of the national association, Detachable Container Association, gave as the basis for his answer that services of the type rendered by the corporate defendant were generally regarded as retail services in the trash removal industry, the following:
"As president of the Detachable Container Association I have had constant and numerous contacts with all members

of the association throughout the United States. I have also had numerous contacts with refuse haulers that are not in the Detachable Container Association. It has always been the considered opinion of all members of the association and other refuse haulers throughout the United States with whom I have had contact that we are engaged in a retail service trade."
In answering that the trash removal business is a business in which the proprietor is generally engaged in rendering retail service, he explained, in part, as follows:
" * * * Our service is available to the general public on a retail or non-wholesale basis with no resale or reuse whatever of the picked up trash being possible. Our customers are the ultimate and 'end users' of the service with no physical possibility that they can resale our service. Our retail service cannot be resold. Our retail services are numerous and extended to many customers involving a relatively small service per customer. The service satisfies the every day needs of the general community in which these services of waste disposal are performed. We carry the refuse to its final resting place to be buried and/or destroyed."

Similar conclusions, personally and as to industry understanding, were expressed from the stand by Robb Tyler, a large local refuse collecting and handling operator, and past president of the national association. The effect of his testimony was somewhat weakened by the facts that although he claimed his operation was that of a retail establishment, actually it is operated in conformity with the Act; and discussions in the industry as to its retail nature were apparently triggered (and the industry reaction perhaps motivated) by recent investigations and suits by the Secretary of Labor.[14]

It is, however, incredible to this court that Congress intended to let any industry volitionally, and from time to time, determine for itself whether it will or will not come within this exemption of the Act. In denying a similar claim for exemption by a small loan company, the court in Aetna Finance Co. v. Mitchell, 1957, 1 Cir., 247 F.2d 190, 193; said:

"* * * the sponsors of the amendatory legislation repeatedly disavowed an intention to permit each industry to decide for itself whether it was conducting a 'retail or service establishment' within the meaning of the exemption."

Moreover, the Supreme Court in Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815, in denying exemption to a small loan company, and in response to the argument that "expert witnesses from the financial industry gave evidence that" Kentucky Finance Company's "business therein was recognized as a retail business"[15], said (359 U.S. 294–295, 79 S.Ct. 758):

"Thus enterprises in the financial field, none of which had previously been considered to qualify for the exemption regardless of the class of persons with which they dealt, and *regardless of whether they were thought of in the financial industry as engaged in 'retail financing'*, remain unaffected by the amendments of § 13(a) (2)." (Emphasis supplied).

Exemptions such as these "are to be narrowly construed against the employers seeking to assert them", and the burden is on the employer to show that his establishment is plainly within the "terms and spirit" of an exemption. Arnold v. Ben Kanowsky, Inc., 1960, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393; Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815; Phillips Co. v. Walling, 1945, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095.

Many cases, in considering the 1949 amendment, and its significance in the determination of whether or not the retail exemption is applicable, quote extensively from the House and Senate Hearings and Reports. However, this court believes that an adequate, and of course authoritative, summary of the law before the amendments, and the reasons for and effect thereof is to be found in the Kentucky Finance Co. case, supra, 359 U.S. at 293–294, 79 S.Ct. at 758:

"* * * The legislative history of the 1949 amendment to § 13(a) (2) demonstrates beyond doubt that Congress was acting in implementation of a specific and particularized purpose. Before 1949 the Administrator, in interpreting the term 'retail or service establishment,' then nowhere defined in the statute, had, in addition to excluding from the coverage of the exemption personal loan companies and other financial institutions, ruled that a business enterprise generally would not qualify as such an establishment unless

---

14. Objections to expression of personal opinion by the individual defendant were sustained; and he was unable to show sufficient familarity with the opinion of the industry to testify with respect thereto.

15. Kentucky Finance Company v. Mitchell, 6 Cir. 1958, 254 F.2d 8, 10—testimony apparently accepted by a majority of the Sixth Circuit panel.

75 percent of its receipts were derived from the sale of goods or services 'to private persons to satisfy their personal wants,' on the theory that sales for business use were nonretail.' This administratively announced 'business use' test was generally approved by this Court in Roland Electrical Co. v. Walling, 326 U.S. 657 [66 S.Ct. 413, 90 L.Ed. 383].

"Congress was dissatisfied with this construction of the statute, and over the objection of the Administrator, who sought to have his 'business use' test legislatively confirmed, passed the 1949 amendment to § 13 (a) (2) to do away with the rule that sales to other than individual consumers could not qualify as retail in deciding whether a particular business enterprise was a 'retail or service establishment,' and to substitute a more flexible test, under which selling transactions would qualify as retail if they (1) did not involve 'resale,' and (2) were recognized in the particular industry as retail. We find nothing in the debates or reports which suggests that Congress intended by the amendment to broaden the fields of business enterprise to which the exemption would apply. Rather, it was time and again made plain that the amendment was intended to change the prior law only by making it possible for business enterprises otherwise eligible under existing concepts to achieve exemption even though more than 25 percent of their sales were to other than private individuals for personal consumption, provided those sales were not for re-

sale and were recognized in the field or industry involved as retail."

It is clear to the court that the sponsors of the 1949 amendment intended the exemption to apply only to "establishments which are traditionally regarded as retail", and "which had previously been commonly recognized as retail".[16] Further:

" * * * When Congress amended the Act in 1949 it provided that pre-1949 rulings and interpretations by the Administrator should remain in effect unless inconsistent with the statute as amended." Mitchell v. Kentucky Finance Co., 359 U.S. at 292, 79 S.Ct. at 758.

1942 Wage and Hour Manual, page 326, Sections 29–31, in listing types of businesses which "are not in the ordinary case sufficiently similar in character to retail establishments [17] to be considered service establishments" included as examples "water supply companies; electric and gas utilities * * * companies engaged in supplying watchmen, guards and detectives for industry * * *"

As the court has pointed out, the corporate defendant's business would not normally be thought of as a (public) utility. The nature of its business is, however, so classified in the Standard Industrial Classification Manual, 1957 Ed., page 143. Major Group 49, "Electric, Gas and Sanitary Services", is composed of Electric Companies and Systems, Gas Companies and Systems, Combination Companies and Systems, Water Supply, Sanitary Services (consisting of Sewerage Systems, Refuse Systems [18] and Sanitary Services, not elsewhere classified), Steam Companies and Systems, and Irrigation Systems.

16. Representative Lucas and Senator Holland, sponsors in Congress. 95 Cong.Rev. 1116, 12499, 12506, 14877.

17. The Bulletins regularly use the phrase "retail and service establishments" and not "retail sales and service establishments." Except for the sale of waste cardboard and paper, heretofore noted, the corporate defendant's sales were not

of goods, but of services. "Typical examples of service establishments, akin to retail establishments * * * are restaurants, hotels, laundries, garages, barber shops, beauty parlors, and funeral homes." Interpretative Bulletin No. 6, December 1938, page 4, section 10.

18. Defined as "Systems primarily engaged in the collection and disposal of refuse."

Further, the Secretary produced as an expert witness Dr. Robert D. Entenberg, Professor of Marketing and Director of the Retail Research Center, Graduate School of Business at the University of Pittsburgh, author of a number of publications concerning retail trade, and familiar with various phases of retail marketing, including discount houses and shopping centers. Having been found qualified, after cross-examination, to testify as an expert, he testified that marketing authorities would classify the corporate defendant's service as that of a utility—a service in the public interest; its use by the public a matter of necessity, not choice; and subject to regulation (from a health standpoint, not rates) ; and that he would so classify it, without regard to what the industry itself might think.

In substance Dr. Entenberg was reluctant to classify the corporate defendant's service as either wholesale or retail, but when pushed for a choice testified that it had more of the attributes of wholesale than retail.[19]

The court's reaction is similar to that of Dr. Entenberg. Defendant's service, although open to the public, is in fact almost exclusively used by industry. It does not clearly fall within the ordinary concepts of wholesale or retail. In view of the inclusion of this service in Standard Industrial Classification Manual with recognized utilities; the testimony of the marketing expert, and the fact that the work of the corporate defendant's employees resembles that of porters and maintenance men, the court concludes as a matter of law that the corporate defendant is not a "retail or service establishment" within Section 13(a) (2) of the Act.[20]

Alternatively, the court finds as a fact that the corporate defendant has failed to prove that its business had traditionally, and before 1949, been commonly recognized as retail, and concludes as a matter of law that the corporate defendant has failed to prove that it is entitled to exemption from the wage and hour requirements of the Act.

### Relief to be Granted

The Clerk is directed to enter judgments in Civil Action No. 13420 and Civil Action No. 13529 in such amounts as counsel for the parties may agree upon and so advise the Clerk. In the event of failure to agree within ten days from the date hereof the court will itself fix such amounts and so advise the Clerk.

Although the court has found the defendants to be in violation of the Act, in its discretion the court will decline to issue an injunction in Civil Action No. 13316. The defendants acted under the advice of very capable and reliable counsel. Moreover, the court was favorably impressed with the honesty and good faith of the individual defendant on the stand. The court believes that the defendants will follow the decision of this court unless and until it is superseded and/or reversed, and that the stigma of an injunction is unnecessary.

------

The foregoing opinion embodies the findings of fact and conclusions of law, pursuant to F.R.Civ.P. 52(a), 28 U.S. C.A. believed by the court to be necessary.

19. He considered that the "historical" concept of retail business was exemplified by the old corner drug store, the old country store; the small barber shop, catering to the general public.

20. A similar conclusion on fairly similar facts was reached in Goldberg v. Saf-T-Clean, Inc., and Kurz, D.C.S.D.Fla., 209 F.Supp. 343.