Peter J. **BRENNAN,** Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

**SUGAR CANE GROWERS COOPERATIVE OF FLORIDA and Robert Lee,** Defendants-Appellees.

No. 72–3409.

United States Court of Appeals, Fifth Circuit.

Oct. 25, 1973.

Rehearing Denied Jan. 11, 1974.

Richard F. Schubert, Sol. of Labor, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Sol., U. S. Dept. of Labor, Edwin G. Salyers, Atty., Atlanta, Ga., Carin Ann Clauss, Associate Sol., Donald S. Shire, Atty., Anastasia T. Dunau, Dept. of Labor, Washington, D. C., for plaintiff-appellant.

John R. Beranek, West Palm Beach, Fla., for defendants-appellees.

Before BELL, GOLDBERG and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The Secretary of Labor appeals from an adverse decision in the district court, 346 F.Supp. 132, as to the applicability of the overtime provisions of the Fair Labor Standards Act, Title 29 U.S.C. Sec. 201 et seq. (FLSA), to certain of defendant's employees. The facts of the case are not in dispute.

The appellee Sugar Cane Growers Cooperative of Florida (Sugar Cane) employs West Indian field laborers for the harvesting of its sugar cane. The laborers enter this country under a joint program supervised by the Departments of Labor and Agriculture and the Jamaican government. Their residence in this country is temporary and is at all times confined to the labor camps which Sugar Cane is required to provide. Additional West Indians, admitted to the United States under the same program, are employed as camp cooks and attendants. Their jobs are limited to preparing the meals for the field laborers and maintaining the barracks and appurtenant facilities used by the workers. Sugar Cane operates four labor camps in Palm

**1008**

Beach County, Florida. One labor camp is adjacent to the sugar mill while the other three are strategically situated throughout the growing area.

Sugar Cane processes sugar cane at its own mill. Steam power, produced in the generating plant, or boiler room, is used in the processing. Forty percent of the steam so produced goes to the mill turbines, which do the processing, and sixty percent goes to three turbo-generators which produce electricity for the entire camp. After passing through the turbo-generators, the remaining "exhaust steam" from two generators is returned to the boiler room, but the exhaust steam from the third is piped to an adjacent plant, operated by Quaker Oats Company in the manufacture of furfural (a plastic base product). After using this steam in its production process, Quaker Oats then returns all but five to ten percent of it to Sugar Cane's boiler room through return pipes for further use. Quaker Oats is under contract to reimburse Sugar Cane for the amount of steam ultimately lost. Sugar Cane purchases a manufacturing by-product from Quaker Oats which is used as fuel for creating steam. Some bagasse generated by the processing of cane is carried from Sugar Cane's mill by conveyor to the Quaker Oats plant where it is processed into various chemical products. There is no physical connection between the two plants except for the system of steam pipes and conveyors. The steam diversion operation in no way affects the duties or hours worked of the boiler room employees. Their duties and hours would necessarily remain the same if the Quaker Oats plant ceased production.

The parties have stipulated that all the above mentioned employees are engaged "in the production of goods for commerce" and thus within the purview of Title 29 U.S.C. Sec. 207, which provides for the payment of wages to covered employees at time and one-half for hours worked beyond forty in one week, except for such employees as are within a specific exception to the FLSA. The parties stipulated also that the field laborers are exempt under § 13(b) (12),[1] and thus not subject to the overtime provisions.

What the Secretary questioned in the lower court and again challenges on appeal is exemption from overtime pay for the camp cooks and attendants and the boiler room employees. Specifically, the following findings of the district court are alleged as error: (1) that the cooks and attendants are exempt under § 13(b) (12), the agricultural exemption; (2) that the cooks are also exempt under § 13(b) (18),[2] the food service exemption; and (3) that the boiler room employees are exempt under Sec. 13(b) (15),[3] the sugar cane processing exemption.

*The Camp Cooks and Attendants*

The Secretary first challenges the finding by the district court that the cooks and attendants, whose work is done exclusively at the labor camp facilities and never in the fields, are exempt from the overtime provision as "agricultural" workers. The term *agriculture* for purposes of the FLSA:

"includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation,

1. Which provides that "[t]he provisions of this section shall not apply with respect to . . . (12) any employee employed in agriculture . . . " Title 29 U.S.C. Sec. 213(b)(12).

2. This section provides, in pertinent part, that "[t]he provisions of this section shall not apply with respect to . . . (18) any employee of a retail or service establishment who is employed primarily in connection with the preparation or offering of food or beverages for human consumption, either

on the premises, or by such services as catering, banquet, box lunch, or curb or counter service, to the public, to employees, or to members or guests of members of clubs;" Title 29, U.S.C. Sec. 213(b)(18).

3. This section provides, in pertinent part, that "[t]he provisions of this section shall not apply with respect to . . . (15) any employee engaged in . . . the processing of . . . sugarcane . . . into sugar (other than refined sugar) or syrup;" Title 29 U.S.C. Sec. 213(b)(15).

growing, and harvesting of any agricultural or horticultural commodities . . . the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." Title 29 U.S.C. Sec. 203(f).

This statutory definition as construed by the Supreme Court embraces both a primary and secondary concept of agriculture:

> "As can be readily seen this definition has two distinct branches. First, there is the primary meaning. Agriculture includes farming in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning. Second, there is the broader meaning. Agriculture is defined to include things other than farming as so illustrated. It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently (sic) to or in conjunction with 'such' farming operations." Farmers Reservoir & Irrigation Co. v. McComb, 1948, 337 U.S. 755, 762–763, 69 S.Ct. 1274, 1278, 93 L.Ed. 1680.

If the duties of the camp cooks and attendants fall within the latter meaning of the term agriculture, the district court's finding that they fall within the agricultural exemption is due to be sustained.

The memorandum opinion of the lower court discussed the applicability to Sugar Cane's operations of a secondary meaning of agriculture, and concluded that the instant dispute was controlled by Wirtz v. Osceola Farms Co., 5 Cir. 1967, 372 F.2d 584. Both parties to this appeal concede that *Osceola Farms* is controlling, and cite it as support for their respective (and contrary) positions. There are substantial similarities between *Osceola Farms* and the present case which are helpful in—but do not entirely control—our consideration of the issues presented here.

Osceola Farms contracted individually with independent growers and employed laborers to harvest sugar cane from the fields of the growers. The cut cane was transported by Osceola to its mill, where it was processed into raw sugar. The distance to the mill from the fields where its employees harvested the sugar cane was in some instances as much as 20 miles but was generally less. Germane to this appeal is the *Osceola Farms* court's discussion of the agricultural exemption as applied to: (1) tractor drivers who moved the cane from the fields to the mill; (2) tractor drivers who transported the laborers from the mill to the fields and brought a midday meal to them in the fields; and (3) repairmen who worked on the agricultural equipment used in the fields, doing their work for the most part at the mill. The Secretary analogizes the position of Sugar Cane's cooks and attendants to that of the equipment repairmen in *Osceola Farms,* i. e. functioning in a supportive capacity to the actual farm laborers but located at an independent, removed facility. *Osceola Farms* held that the repairmen were not exempt as they did not satisfy the requirement in the secondary meaning of agriculture that incidental work be performed "on a farm". Sugar Cane argues to the contrary that its cooks and attendants are most similar to the drivers in *Osceola Farms* who transported first the workers, and later a midday meal, to the fields where the harvesting took place. These drivers were held to be exempt because the function they performed was necessary to the farming operation and terminated on the physical property constituting the "farm".

The court below determined that both the camp cooks and the attendants were exempt as within the secondary meaning of agriculture. With respect to their ac-

tivity being "incident to" farming, the court said that "the preparation of food and maintenance of barracks must be viewed as incident to the total sugar processing and agricultural operation and a necessary adjunct to it, . . ." On the question of whether or not the work of the cooks and attendants was also "on a farm", the lower court observed that the facilities were "located adjacent to and near the farmlands . . ." and further pointed out that it considered as "most significant" the classification by the Secretary of Labor of all West Indian workers as "agricultural workers" for purposes of entry into this country.[4]

We first observe that activities such as those in question have never been classified as within the *primary meaning* of agriculture. Although Sugar Cane argues to the contrary such a classification has uniformly been rejected by the courts considering identical or similar support operations. Maneja v. Waialua Agricultural Co., 1955, 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040; Hodgson v. Ewing, 5 Cir. 1971, 451 F.2d 526; Wirtz v. Osceola Farms Co., supra. The Secretary does not dispute that the cooks' and attendants' work is "incident to or in conjunction with" the sugar cane farming done by the field laborers. *Osceola Farms* is ample authority for holding that the preparation of food is as integral a part of the farming operation as is the transportation of that food to the workers. It seems obvious further that as to these particular govern-ment sponsored labor camps, the maintenance of the living quarters is no less an integral part of the entire farming operation.

But the crucial issue here is whether or not the work of the cooks and attendants is done "on a farm" so as to satisfy the latter element of the secondary meaning of agriculture. The Secretary argues that it is not on a farm because "the farm" includes no more than the separate physical sites where the agricultural work is performed. This assertion is supported by reference to the non-exempt repairmen in *Osceola Farms* as in a patently analogous situation to that of the cooks and attendants. The argument fails to convince us inasmuch as the *Osceola Farms* repairmen were located in a processing mill as much as 20 miles from the leased land where the harvesting took place.

Sugar Cane argues that the exemption of the truck drivers in *Osceola Farms* supports the position that the cooks and attendants work on a farm because the labor camps in question are as close to the farmland as it is physically possible for such 375 man camps to be. However, the fact that the activities of the exempted *Osceola Farms* truck drivers extended into the fields where the cane was harvested divests this argument of its force. We think that the work done by the cooks and attendants here lies factually somewhere in between the examples extracted from *Osceola Farms*.

 Although we find no precedent directly in point and the issue presents

4. Appellee Sugar Cane relies heavily upon the fact that the Department of Labor classifies all the West Indian laborers admitted into this country under the U.S.-Jamaican agreement as "agricultural workers." The district court, in its memorandum opinion, specifically found it "most significant" that the Secretary would consider the cooks and attendants to be agricultural workers for purposes of entry into this country, but not for purposes of the FLSA. The Secretary defends this apparent inconsistency by distinguishing the authority under which the laborers are in fact admitted into the U.S., Title 8 U.S.C. Sec. 1101 et seq., Immigration and Nationality Act, from the FLSA in which the term "agriculture" is statutorily defined. Thus it is argued that although the designation on the agency form Clearance Order, which was adopted pursuant to the Secretary's regulation covering the placement of agricultural workers, 20 C.F.R. 602.8(a) uses the words "agricultural worker", such fact is irrelevant to what Congress intended when it created exemptions to the wage and hour provisions of the FLSA.

This issue is not controlling, but lends at least arguable support to the district court's conclusion that the cooks and attendants are exempt as agricultural workers under the FLSA.

difficulty, we conclude that the work done by the cooks and attendants in this case is "on a farm" for purposes of the agricultural exemption. It would not be physically possible for Sugar Cane to place its labor camps right in the middle. of the cane fields. Sugar Cane does not claim an agricultural exemption for workers whose efforts are confined to a processing mill at some remote location. These employees, rather, perform their work at a location in close proximity to the fields worked by the laborers for whom they cook and clean. Without overlooking the general principle that exemptions are to be construed narrowly against those seeking to assert them, Wirtz v. Jernigan, 5 Cir. 1968, 405 F.2d 155, we think the Secretary's construction of the exemption in this situation is unnecessarily narrow and technical. Our interpretation of "on a farm" seems to us to be more nearly in line with what that terminology really envisages. The drafters of the section could not anticipate every conceivable factual situation arising in the future under the agricultural exemption, and the statutory language should not be read with such an assumption. We hold, consequently, that because of the unique facts of this case, the question of whether the work of the camp cooks and attendants was done "on a farm" should be resolved against the Secretary. A labor camp housing 375 men is "on a farm" in the only sense it can be if it is in fact adjacent to and near the farmland being harvested.

Having found that the camp cooks and attendants are exempted from overtime coverage as within the secondary meaning of agriculture, we do not reach the question of whether the cooks. would be exempted under the food service exemption, and of course intimate no views in that respect.

### The Boiler Room Employees

The Secretary's second contention on appeal is that the lower court erred in holding that the employees who work in the boiler room where steam is produced are exempt by virtue of Sec. 213(b)(15). That section makes the overtime provision inapplicable to any employee engaged in the processing of sugar cane into sugar. The parties agree that absent the contract with Quaker Oats for supplying a portion of the steam produced to that corporation, the employees in question would be exempt. We are called upon then to decide the effect upon the exemption of that transfer of steam to Quaker Oats.

The milling of sugar cane, in addition to the cane juice which is ultimately refined into sugar, also produces a byproduct, "bagasse", the fibrous residue of the cane stalks. Most mills use their bagasse as fuel to produce steam, but Sugar Cane since 1966 has sent its bagasse to the adjacent Quaker Oats plant by conveyor belt. Quaker further processes the bagasse into certain chemical products and again by conveyor belt returns the residue from that operation, now in the form of pellets, to Sugar Cane. The pellets are burned as fuel just as the original bagasse would be used in the usual operation. Quaker Oats is without an independent source of steam power, and instead uses steam exhaust transmitted by pipes from one of the defendant's turbo-generators, as related in the introduction to this opinion. This steam is returned to Sugar Cane by pipes. Quaker Oats pays Sugar Cane for the steam lost in the process, amounting usually to one to two thousand dollars annually. The record indicates that this reciprocal arrangement is unique, there being no known similar arrangement anywhere in the world. The boiler room employees are paid straight hourly rates for hours worked up to 48 hours per week, but do not receive time and one-half for hours worked in excess of 40 hours and up to 48 hours. Time and one-half is paid for hours worked over 48 in one week.

Two competing principles of law must be applied to this peculiar factual situation. Both parties agree that without the diversion of steam to Quaker the employees would fall squarely within the

sugar cane processing exemption. The Secretary's position is that this case falls within the rule that no exemption may be allowed for compensation of employees whose work consists of both exempt and some non-exempt activity. Hodgson v. Wittenburg, 5 Cir. 1972, 464 F.2d 1219, 1221. Sugar Cane concedes that the rule of law cited by the Secretary is correct, but asserts that it may not be applied to the case at bar because the boiler room employees perform no non-exempt work, the view taken by the district court. That conclusion is reached upon these considerations: (1) all control over the diverting process is exercised by Quaker Oats and the boiler room employees have no connection with it; and (2) a cessation of the diversion of steam to Quaker would result in no change whatsoever in the duties, the hours worked, or the workload of the Sugar Cane boiler room employees.

We reverse the district court as to the exemption of these employees.

The question is simply whether or not the boiler room employees in fact engage in any non-exempt work. Sugar Cane advances the plausible contention that they cannot be *engaged* in work that is non-exempt unless such work can be identified as something separate and distinct from the exempt work that is done. Since the hours and workload are unaffected by the Quaker Oats operation, appellee asserts that no non-exempt work is being done. This argument confuses the criterion for determining when one is *engaged* in exempt or non-exempt work. Inability to quantify the labor required to produce that which precludes exemption is not the guide. Controlling, rather, is the cause and effect relationship between the labor and the non-exempt activity.

We turn for illustration to cases construing the exemption for businesses not "engaged in commerce or in the production of goods for commerce", Title 29 U.S.C. Sec. 202. In Mitchell v. Jaffe, 5 Cir. 1958, 261 F.2d 883, the employer was in the automobile salvage business, a wholly intrastate concern. His employees would separate marketable items such as motor parts, tires, and so on, from wrecked cars, and the remaining scrap was sold to a nearby junkyard, and thence ultimately moved in interstate commerce. Although total sales from this scrap comprised only 1.67 percent of the employer's gross receipts, because scrap removal was a "regular, non-sporadic part" of his business, 261 F.2d at 887, he was nonetheless held to be engaged in the production of goods for commerce. It was deemed entirely irrelevant that his employees would necessarily have separated salable items from scrap regardless of whether he could find a buyer for the scrap. The point was that he did indeed sell it, and it went from the vendee into interstate commerce. While no quantifiable amount of his employees' labor could be attributed to such production, since they had to do the separating in any case, it was still the *cause* of an *effect* which precluded exemption.

A similar result was reached in Tilbury v. Rogers, 5 Cir. 1955, 220 F.2d 757, aff'g per curiam, W.D.La.1954, 123 F. Supp. 109. The employer was in the retail meat business, selling meat which was cut and prepared for sale in his shop, a wholly intrastate operation. The bones and other inedible scrap were sold, the revenue from such sales constituting .216 of 1 percent of total dollar sales. Despite the fact that such scrap had to be separated from the meat prior to sale of the meat, the butchers were held to be producing goods for commerce because the scrap ultimately moved interstate.

The exemption for employees engaged in sugar cane processing may be contradistinguished from the concept of goods produced for interstate commerce because it is exclusive rather than inclusive, but this alters not at all the meaning of the term *"engage"*. Each statutory section is triggered by a cause and effect relationship between the activity of the employees and a non-exempt result. The crux of the question is not

that the employees would do the same work absent a buyer of metal scrap, or a buyer of meat scrap or a buyer of surplus steam, but that there was in fact such a buyer. Quaker Oats paid for the steam it received from Sugar Cane. Had it produced its own steam, Quaker Oats would have been required to pay its steam production employees overtime for hours worked in excess of 40 hours per week.

We add in this regard that in our opinion the congressional decision[5] to relocate the sugar cane processing exemption in a different code section[6] and to amend the exemption by using the word "employee" instead of an "employer" (engaged in the first processing of sugar cane), does not signal any changed legislative concept of the meaning of the word "engaged". The change on its face was intended to preserve the exemption for employees who do solely sugar cane processing, but whose employer also engages in other and non-exempt activities. The above discussion should also make clear our view that the doctrine of *de minimis* has no viable place in the interpretation of the FLSA. It clearly does not. Cf. Mabee v. White Plains Publishing Co., Inc., 327 U.S. 178, 66 S.Ct. 21, 90 L.Ed. 607; Mitchell v. Jaffee, supra; Tilbury v. Rogers, supra.

### Conclusion

This case presents close, difficult, and no doubt Congressionally unanticipated factual questions. Applying the law as we read it from the decided cases dealing with exemptions from the FLSA, we are in agreement with the trial court in connection with the agricultural nature of the work done by the camp cooks and attendants. But we disagree with the trial court as to the cane processing exemption it extended to the boiler room employees. Our study of the authorities leads us to conclude that the boiler room employees should not have been exempted, despite the fact that their labor contribution to Quaker Oats is incapable of computation and quantification.

Affirmed in part, reversed in part.

---

5. By the 1966 Amendments to the Fair Labor Standards Act.

6. From Title 29 U.S.C. Sec. 207(c) to Title 29 U.S.C. Sec. 213(b)(15).