Harold ADKINS, on behalf of all other
plaintiffs similarly situated, known
and unknown, Plaintiffs,

v.

MID–AMERICAN GROWERS, INC.,
a corporation, Defendant.

No. 88 C 980.

United States District Court,
N.D. Illinois,
Eastern Division.

May 2, 1997.

Donald R. Brewer, Donald R Brewer, Chtd., Dundee, IL, Jonathan D. Moses, Chicago, IL, John William Billhorn, William J. Sneckenberg & Associates, Chicago, IL, for plaintiffs.

Camille Annette Olson, Anthony B. Byergo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Donald Alan Gift, Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., LaSalle, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

This opinion follows a five-week bench trial in which decision was reserved pending written opinion. This is the written opinion addressing the merits of the case.

### I. THEORIES OF THE CASE

Plaintiffs respond that they are entitled to "time and a half" compensation for overtime worked at defendant's greenhouse operation under the Fair Labor Standards Act ("FLSA"). During the two-year time period immediately preceding this lawsuit, plaintiffs received straight wages for overtime hours worked.[1] Defendant claims that it is entitled to an "agricultural" exemption from the overtime requirements contained in the FLSA.

Plaintiffs argue that, because *some* of the work that they performed during various workweeks was "non-exempt" within the meaning of the statute, defendant may not avail itself of the agricultural exemption. Plaintiffs further maintain that, because defendant's use of the exemption is an affirmative defense, it is defendant's burden to

1. The two-year period was previously designated as the appropriate time period for this suit. *See Adkins v. Mid–American Growers,* 831 F.Supp. 642 (N.D.Ill.1993). Moreover, in late 1990 and early 1991, one hundred and forty-six other past and present employees of Mid–American Growers filed written consents to join this action pursuant to 29 U.S.C. § 216(b). Because of the dates the consents were filed, the parties treated the period between November 1988 and the end of 1991 as the "relevant time period."

prove that no non-exempt work was performed by plaintiffs during the weeks in which they worked overtime and were compensated with straight wages.

There are three categories of work performed by plaintiffs which plaintiffs allege are nonexempt:

1. Work performed on plants obtained by defendant from independent growers.

2. Work performed relating to "hard goods" such as pots, soil, and the like.

3. Work performed at the residence of Nick Van Wingerden ("Van Wingerden"), President of Mid–American Growers ("defendant" or "MAG"), such as lawnmowing, gardening, etc.

As is plain from this recitation, plaintiffs focus on the *product* upon which they worked, as opposed to the *type of work* they performed. Defendant, on the other hand, argues that virtually all the *types of work* performed by plaintiffs fit into either the "primary" or "secondary" definitions of agriculture contained in the FLSA regardless of the product upon which the work is performed. Moreover, defendant submits that even if some of the work in question were non-exempt within the meaning of the statute, such work is of an insignificant amount and should be disregarded under the *de minimis* doctrine.

## II. LEGAL STANDARD

### A. "Agricultural Exemption"

Congress enacted the FLSA as a means of regulating minimum wages, maximum working hours, and child labor in industries that affect interstate commerce. 29 U.S.C. § 202; 81 Cong. Rec. 7648 (1937). For example, with respect to maximum hours, Congress provided that

... no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times

the regular rate at which he is employed....

29 U.S.C. § 207.

■ In addition to such regulations, Congress established several exemptions to the FLSA maximum hour or "overtime" provisions. These exemptions are to be construed narrowly by interpreting courts. In a case similar to the one at bar, an employer sought to avail itself of an overtime exemption for "retail and service establishments" under the FLSA. *Arnold v. Ben Kanowsky,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). However, the Supreme Court stated that "these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold,* 361 U.S. at 392, 80 S.Ct. at 456; *see also Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815 (1959) ("It is well settled that exemptions from the Fair Labor Standards Act are to be narrowly construed."); *A.H. Phillips v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945) (any exemption under the FLSA must be narrowly construed). The Seventh Circuit relied on this language in *Klein v. Rush–Presbyterian–St. Luke's Medical Center,* 990 F.2d 279, 282 (7th Cir.1993), a case dealing with the exemption of "executives" from overtime requirements under FLSA. *See* 29 U.S.C. § 213(a)(1).

Indeed,
[t]he Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' ... Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress.

*A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 492, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945) (citations omitted).

The exemption at issue in the instant case is set forth in section 213(b)(12) of the FLSA. Section 213(b)(12) exempts from the overtime requirements "any employee employed in

agriculture." 29 U.S.C. § 213(b)(12). Like all such exemptions, the agriculture exemption should be narrowly construed. *Damutz v. William Pinchbeck,* 158 F.2d 882, 883 (2d Cir.1946).

■ Notwithstanding the narrow construction of the exemption, the definition of agriculture embodied in the exemption is intentionally extremely comprehensive and entitled to *broad* construction. *See, e.g., Reich v. Tiller Helicopter Svcs., Inc.,* 8 F.3d 1018, 1024 and n. 4–5 (5th Cir.1993). Section 203(f) defines agriculture as follows:

'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities ..., the raising of livestock ... and any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market, or to carriers for transportation to market.

29 U.S.C. § 203(f). Thus, while the agriculture *exemption* is narrowly construed against the employers seeking to assert it on the one hand, such employers benefit from the broad scope of the agriculture *definition* on the other.

■ The Supreme Court first addressed the scope of the agricultural exemption in *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 760–763, 69 S.Ct. 1274, 1277–1278, 93 L.Ed. 1672 (1949). The Court stated that the determinative issue in analyzing the scope of the exemption was not whether the work "is necessary to agricultural production ... [but whether it] can itself be termed agriculture." *Id.* at 760, 69 S.Ct. at 1277. The Court also concluded that the exemption recognized and applied to two types of agricultural activity: primary and secondary. The Court explained,

[w]hether a particular type of activity is agricultural depends, in large measure, upon the way in which that activity is organized in a particular society....

[That is, t]he question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity.... As can be readily seen, this definition [of agriculture] has two distinct branches. First, there is the primary meaning. Agriculture includes farming in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning. Second, there is the broader meaning. Agriculture is defined to include things other than farming.... It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently to or in conjunction with 'such' farming operations.

*Farmers Reservoir & Irrigation Co.,* 337 U.S. at 760–763, 69 S.Ct. at 1277–1279. For the broader "secondary" agriculture activity to fall within the scope of the exemption, the Court stated that the activity must meet two distinct criteria: (1) it had to be performed either by a farmer or on a farm and (2) it had to be incidental to or in conjunction with farming operations. *Id.* at 766 and n. 15, 69 S.Ct. at 1280 and n. 15.

■ In *Maneja v. Waialua Agricultural Co.,* 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040 (1955), the Court again addressed the scope of the agricultural exemption. *Waialua Agricultural Co.,* 349 U.S. at 262–263, 75 S.Ct. at 724–725. *Waialua* effectively narrowed the second criterion of the test for secondary agricultural activity so that, for secondary agricultural activity to be exempt, it had to be performed by a farmer or on a farm and it had to be incidental to or in conjunction with those of the farmer for whom the relevant activity was performed or the farm on which the relevant activity is performed. *Id.* In other words, the farming operations referred to in the second criterion must be the farming operations of the farmer for *whom it was done* or on the farm *where it was done.*[2]

**2.** *See infra* note 12.

## B. Burden of Proof

It is undisputed that an employer who claims an exemption under the FLSA has the burden of proving its applicability. *E.g., Mitchell v. Kentucky Fin. Co.*, 359 U.S. 290, 291, 79 S.Ct. 756, 757, 3 L.Ed.2d 815 (1959); *Walling v. General Indus. Co.*, 330 U.S. 545, 547–48, 67 S.Ct. 883, 884, 91 L.Ed. 1088 (1947). Moreover, the conditions set forth in the language of the FLSA are "explicit prerequisites to exemption." *Arnold v. Ben Kanowsky*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); *see also Walling*, at 547–48, 67 S.Ct. at 884 (respondent had the burden of proving the existence of six conjunctive conditions, if it relied on its defense of exemption). Thus, in order to take advantage of the agricultural exemption, defendant must prove that the work performed by the plaintiffs during any workweek in which plaintiffs worked overtime and were not compensated pursuant to the statutory overtime provision is subject to the exemption. Defendant must therefore establish that such work constituted either secondary or primary agriculture under the FLSA. If defendant should fail to meet its burden, the plaintiffs will prevail. Plaintiffs would then bear the burden of proving damages at a separate proceeding on the issue.[3]

## C. Applicability of the *"De Minimis"* Doctrine

Defendant contends that even if it should fail to establish that the relevant activity is exempt under the FLSA, the totality of such work is inconsequential under the *de minimis* doctrine. Plaintiff responds, and this court agrees, that the *de minimis* doctrine does not apply in this context.

Defendant relies primarily on the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct.

1187, 90 L.Ed. 1515 (1946), where the Court held that "it is appropriate to apply a *de minimis* doctrine so that insubstantial and insignificant periods of time . . . need not be included in the statutory workweek." *Id.* at 693, 66 S.Ct. at 1195. For further support, defendant cites *Reich v. New York City Transit Auth.*, 45 F.3d 646 (2d Cir.1995); *Lindow v. United States*, 738 F.2d 1057 (9th Cir.1984); and *Frank v. Wilson & Co.*, 172 F.2d 712 (7th Cir.), *cert. denied*, 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727 (1949). Each of these cases is easily distinguishable from the case at bar and unpersuasive in contrast to such cases as *Dole v. West Extension Irrigation District*, 909 F.2d 349 (9th Cir.1990) and *Brennan v. Sugar Cane Growers Cooperative of Florida*, 486 F.2d 1006 (5th Cir.1973), which suggest that the doctrine of *de minimis* should not apply to exemptions under the FLSA.

*Reich, Lindow,* and *Frank* address what employee activity can be counted toward the workweek. That is not the issue before this court. These cases applied the *de minimis* doctrine and determined that, if the activity is an integral and indispensable part of the predominant activity or incidental to such activity, then it is counted toward the workweek and compensable under the overtime provisions.[4] *Reich*, 45 F.3d at 652 (work performed by canine officers during commute with assigned dogs held *de minimis* under the FLSA); *Lindow*, 738 F.2d at 1062–63 (seven to eight minutes of daily pre-shift work is *de minimis* under the FLSA); *Frank*, 172 F.2d at 716 (five minutes of required preliminary or preparatory activity each day held to be *de minimis*); *see also Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401 (5th Cir.1976) (*de minimis* doctrine should be applied to determine whether pre–8:00 a.m. activities, when combined, result in "so

3. However, where an employer has kept inadequate records and the employee produces sufficient evidence to establish the amount of work for which the employee was not properly compensated "as a matter of just and reasonable inference[,]" the burden shifts to the employer to come forward with evidence to negate the reasonableness of such inference. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946). If the employer fails to produce such evidence, the court may award approximate damages. *Id.*

4. In making this determination, the court must view the activity in the aggregate and consider "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow*, 738 F.2d at 1063.

slight an expenditure ... as to be *de minimis* and therefore not compensable"). However, while courts have recognized the doctrine of *de minimis* within the context of the FLSA and, more specifically, with respect to the calculation of overtime, to say that the *de minimis* doctrine therefore is applicable in determining the applicability of the FLSA exemptions is too broad a principle and one that is expressly contradicted by caselaw.

In *Brennan v. Sugar Cane Growers Cooperative of Florida*, 486 F.2d 1006 (5th Cir. 1973), the Fifth Circuit carried the discussion of the *de minimis* doctrine into the context of exemptions under the FLSA. The defendant, a sugar cane processor, sought to avail itself of the agricultural exemption. It argued that the doctrine should apply where a third party used and paid for a small portion of the steam exhaust transmitted from one of the defendant's processor's turbogenerators, in part, because the cessation of the diversion of steam would not change the duties of defendant's boiler room employees. Despite this argument, the court held that the boiler room employees were engaged in nonexempt work and thus were not exempt from the FLSA overtime provisions as employees engaged in the processing of sugar cane. Moreover, the court proclaimed that "the doctrine of *de minimis* has no viable place in the interpretation of the FLSA. It clearly does not." *Id.* at 1013.

Similarly, in *Dole*, the defendant argued that, because a mere three percent (3 %) of the land served by the irrigation district had been converted from agricultural to commercial or residential use, the doctrine of *de minimis* should preserve its entitlement to the exemption.[5] *Id.* at 351. Noting that the FLSA exemptions must be narrowly construed against employers and that "insistence on the letter· of the law serves the FLSA's purpose of protecting commerce from unfair competition based on substand-

ard conditions[,]" the court held that " 'the doctrine of *de minimis* has no viable place in the interpretation of FLSA' " and that the exemption did not apply. *Id.* at 351–52 (quoting *Brennan*, 486 F.2d at 1013). These principles have been articulated (and the doctrine of *de minimis* rejected) in cases involving nonagricultural exemptions. *See, e.g., Mabee v. White Plains Publ'g Co.*, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946); *Mitchell v. Jaffe*, 261 F.2d 883 (5th Cir.1958); *Tilbury v. Mitchell*, 220 F.2d 757 (5th Cir. 1955), *aff'g per curiam*, 123 F.Supp. 109 (W.D.La.1954).

However, at least one case has applied the *de minimis* doctrine in an agricultural exemption case. *Damutz v. William Pinchbeck*, 158 F.2d 882, 883 (2d Cir.1946) (emphasis added) (where one-half of one percent of defendant's business consisted of marketing cut flowers obtained from an independent grower "that business was rightly disregarded both under the *de minimis* doctrine *and* also because it was not shown to have been interstate"). Read together, *Damutz, Dole, Brennan*, and the cases on which they rely suggest that the doctrine of *de minimis* does not apply in the context of FLSA exemptions unless the challenged activity is not shown to fall within the purview of the FLSA, e.g., the activity is not interstate commerce, and comprises a virtually infinitesimal portion of the defendant's otherwise exempt business. To the extent that the *Damutz* decision is premised on the *de minimis* doctrine alone, the court respectfully rejects, the rationale of the Court of Appeals for the Second Circuit.

As is evident from the discussion above, the cases relied on by defendant and plaintiffs all deal with compensation. However, they approach the subject from two different perspectives: The cases cited by defendant ask what activity and what quantity of such activity is applicable to the workweek and,

5. At issue was the application of the agricultural irrigation exemption for "any employee employed ... in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways ... used *exclusively* for supply and storing of water for agricultural purposes." 29 U.S.C. § 213(b)(12) (emphasis added). While Congress's use of the term "exclusively" provides a clear indication of Congress's intent to limit the

exemption, it is well established that all FLSA exemptions are to be construed narrowly against the employer. *E.g., A.H. Phillips Inc. v. Walling*, 324 U.S. 490, 492, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945). Thus, the inclusion of that term does not diminish the applicability of *Dole* with respect to the construction of other portions of the agricultural exemption or FLSA exemptions in general.

ultimately, whether the overtime provisions apply. The cases cited by plaintiffs ask whether the activity performed is exempt pursuant to the language of the FLSA once it is clear that the overtime provisions are applicable. Each set of cases solves a very different query—the parameters of the workweek for purposes of overtime compensation versus the parameters of an exemption-therefore their holdings may not be interchanged. Furthermore, in light of the applicability of the *de minimis* doctrine to the compensable workweek analysis, it would create a windfall to employers to liberally apply the doctrine in the context of the FLSA exemptions as well. It is beyond cavil, however, that the FLSA exemptions are subject to *narrow* construction. This principle permits the FLSA's remedial benefits to extend to the greatest possible number of persons. *Barker v. Billo,* 1984 WL 3171 at *4 (E.D.Wis. May 1, 1984). Unqualified application of the *de minimis* doctrine in the context of exemptions would encourage employers to require their employees to perform a minimal amount of exempt tasks each day simply to avoid the FLSA's overtime compensation provision. *Id.*

 Finally, the view that the *de minimis* doctrine should not apply, or should be applied sparingly, is reinforced by the well-settled rule that an employee's performance of both exempt and nonexempt work in the same workweek precludes application of the exemption. *Wirtz v. Tyson's Poultry, Inc.,* 355 F.2d 255, 257 n. 1 (8th Cir.1966); *see also Marshall v. Gulf & W. Indus.,* 552 F.2d 124, 126 (5th Cir.1977); *Brennan,* 486 F.2d at 1012 (citing *Hodgson v. Wittenburg,* 464 F.2d 1219, 1221 (5th Cir.1972)); *Mitchell v. Hunt,* 263 F.2d 913 (5th Cir.1959); *Tobin v. Blue Channel Corp.,* 198 F.2d 245 (4th Cir.1952). This rule exemplifies the narrowness with which the exemption should be construed when considering both exempt and nonex-

empt work by the same employee. In light of the above, the doctrine of *de minimis* should be applied, if at all, with great caution so as not to derogate the policy considerations that undergird the FLSA and the Supreme Court's directive that the exemption be narrowly construed. *See Barker,* 1984 WL 3171, at *4.

With these guiding principles in mind, the court will take on the notably difficult task of determining whether the agriculture exemption applies to the unique fact pattern presented in the instant case.[6]

### III. FINDINGS OF FACT

1. Defendant is a corporation which operates a large greenhouse in Granville, Illinois. During the relevant time period, the indoor area of the greenhouse covered approximately 23 acres (1 million square feet), with additional acreage outdoors used for shipping docks, automated production lines, offices, and, on a seasonal basis, for growing plants.

2. The greenhouse is defendant's "farm." The indoor areas of the greenhouse are highly regulated environments designed to regulate the growing process.

3. Defendant produces from seed, cutting, bulb, and starter plants in excess of one million plants each year. These plants accounted for at nearly ninety-eight percent (98%) of defendant's total sales from 1986 through 1991.

4. Defendant does not compensate its employees at the statutory rate of time and one-half for hours in excess of forty (40) per week.

5. Plaintiffs are employees of MAG who worked overtime during an unspecified number of weeks during the relevant time period.

6. Plaintiffs perform a wide variety of tasks such as mixing soil, seeding, planting, watering, spraying, inspecting for damage

---

6. In a separate concurring opinion in *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949), Justice Frankfurter wrote the following apropos passage:
 Both in the employments which the Fair Labor Standards Act covers and in the exemptions it makes, the Congress has cast upon the courts the duty of making distinctions that often are

bound to be so nice as to appear arbitrary in relation to each other. A specific situation, like that presented in this case, presents a problem for construction which may with nearly equal reason be resolved one way rather than the other.
 *Id.* at 770, 69 S.Ct. at 1282.

and disease, and adjusting light intensity, temperature and humidity to produce, cultivate, grow, and care for horticultural commodities. In addition, plaintiffs perform various other duties incidental to and in conjunction with these farming operations such as equipment maintenance, preparing products for shipment, unloading and unpacking incoming materials, and direct shipment and route sales truckdriving.[7]

7. Most plaintiffs are either growers, assistant growers, waterers, greenhouse coordinators, general laborers, or nightwatchmen, although other categories of laborers are involved.

8. Defendant keeps no records detailing its employees' work duties during the course of a day or week.

9. The types of plants upon which a given employee may work varies widely from day to day and week to week.

10. Defendant ships plants into its greenhouse from independent growers from warm, southern climates, mainly Florida. These plants are either individual plants or "dish gardens."[8] Sometimes the plants are replanted in "combo baskets."[9]

11. Some of these plants are resold at retail within twenty-four hours of their arrival at MAG; others are held for longer periods of time and undergo a process called "acclimatization."

12. "Acclimatization" is a process whereby an individual organism's adaption or increased tolerance to a changed environment over time is manifested by a physiological adjustment of that organism to the changed environment.

13. The plants intended to undergo acclimatization are not segregated or separated within defendant's greenhouse in any manner that would guarantee that such plants undergo the full acclimatization process before they are resold.

14. Defendant determines which plants to resell by visually inspecting the plants and selecting the plant that appears to be the heartiest. This selection process does not necessarily yield plants that have undergone acclimatization. Thus, it is unclear how long each plant is held prior to resale.

15. Some portion of the plants purchased from independent growers are sold prior to completion of the acclimatization process.

16. Some of the plants purchased from independent growers are intended to undergo acclimatization and then be resold. Other plants constitute what are called "cover purchases."

17. "Cover purchases" are horticultural commodities, in this case plants, purchased to replace production losses and shortfalls that resulted from crop failures. Such purchases are necessary to "cover" existing contractual commitments.

18. Some plants are fed before being shipped out. However, the grower generally has the discretion to feed or not to feed the plants.

19. In addition to plants from independent growers, defendant purchases "hard goods" such as fertilizer, soil mixtures and additives, decorative holiday gimmicks, plastic and ceramic pots.

20. These hard goods are used primarily with plants grown by defendant that are not shipped from independent growers. However, defendant sometimes uses such hard goods with the plants it purchases from independent growers. Also, defendant resells a small portion—less than one tenth of one percent (.1%)—of the hard goods at retail to its customers and neighboring greenhouses as a courtesy.

21. From 1986 to 1991, defendant sold between $ 3,000 to $ 9,000 worth of hard goods. These sales totaled approximately eight one-hundredths of one percent (.08%) of defendants' total sales during that period. The hard goods were sometimes sold at cost.

7. Route Sales Truckdriving refers to the sale of plants and hard goods by MAG employees from trucks that travel specific sales routes.

8. "Dish gardens" or "Combo baskets" are a mix of various foliage planted in ceramic or wicker baskets.

9. See id.

22. Van Wingerden is the president and sole-shareholder of MAG. Van Wingerden lives in a house on the MAG property that is located approximately 400–500 feet from the greenhouse.

23. Over a period of five years, Porfirio Ortiz and, from time to time,[10] another employee, mowed the lawn and performed other tasks at the Van Wingerden home. On at least two occasions, Ortiz took chairs from around the swimming pool down into the basement of Wingerden's house. In addition, Ortiz cleaned up some of the construction after Wingerden built an addition to his house.

24. Other laborers would sometimes wash Van Wingerden's car, in addition to performing other menial tasks. Some employees helped bring in the hay for feeding Van Wingerden's horses. These horses were not used in connection with the greenhouse operation. In addition, the maintenance people from the greenhouse would perform mechanic work and/or routine maintenance on Van Wingerden's personal car and the personal car of his wife. Also, Van Wingerden's wife has a friend who works at the greenhouse who sometimes served as a babysitter for the

Van Wingerdens in lieu of working at the greenhouse.

25. In the thirteen month period in which plaintiffs monitored defendant's shipments, defendant received ninety-six shipments of plants from independent growers, which were held for various amounts of time before resale.

## IV. CONCLUSIONS OF LAW

### A. Focus of Analysis: Work Performed or Type of Products?

Since the inception of this case, the parties have been at odds about what should be the court's focus of analysis—work or product. Out of the profusion of authority cited by both parties on this issue emerges a result that gives strong consideration to both. Plaintiff cites to sections 780 of Title 29 of the Code of Federal Regulation in reliance on the Code's interpretation of agriculture to prove that the court's analysis should be product based.[11] While sections 780.137 and 780.141 make repeated distinctions between a farmer's own products and those products which are purchased and/or shipped in from other farmers, the activity performed on such products is clearly relevant.[12] Defen-

---

**10.** During the summer months when Ortiz was taking care of Wingerden's lawn he had no other duties in the greenhouse unless there were plants on vehicles for shipping.

**11.** Defendant objects to the court's consideration of the interpretive bulletin of the Wage and Hour Administrator, 29 C.F.R. § 780. However, the Supreme Court has held that interpretive bulletins provide a "practical guide to employers and employees" and, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift,* 323 U.S. 134, 138, 140, 65 S.Ct. 161, 163–64, 89 L.Ed. 124 (1944); *see also United States v. American Trucking Ass'ns,* 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 ("[S]uch interpretations are entitled to great weight."). In light of these holdings and defendant's lack of authority to support its view, the court finds that defendant's objections are baseless.

**12.** Specifically, section 780.137 provides,
 ... [P]ractices performed by a farmer can [constitute agriculture] only in the event that they are performed in connection with the farming operation of the same farmer who

performs the practices. Thus, the requirement is not met with respect to employees engaged in connection with farming operations that are not his own.... The processing by a former of commodities of other farmers, if incident to or in conjunction with farming operations, is incident to or in conjunction with the farming operations of the other farmers and not incidental to or in conjunction with the farming operations of the farmer doing the processing.
29 C.F.R. 780.137 (citations omitted).
Section 780.141 further explains,
 ... No practice performed with respect to farm commodities is within the language under discussion by reason of its performance on a farm unless all of such commodities are the products of that farm.
29 C.F.R. § 780.141 (citations omitted).
Finally, section 780.149 provides,
 Employees of a grower of nursery stock who work in packing and storage sheds sorting the stock, grading and trimming it, racking it in bins and packing it for shipment are employed in 'agriculture' provided that they handle only products grown by their employer and their activities constitute an established part of their employers agriculture activities and are subordinate to his farming operations.
29 C.F.R. § 780.149.

dant, on the other hand, relies on section 203(f) of Title 29 of the United States Code for the proposition that the determination of what is secondary agriculture is work-based. However, the language of that provision suggests that both the practice and the product are to be considered: "The FLSA ... exempts 'secondary' agriculture activities which encompass any practice performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f).

The touchstone of the analysis is therefore whether the *work* performed constitutes primary or secondary agriculture. The answer to that query is determined, in part, by the product upon which or in connection with which such work is being performed. For example, if by merely watering seed, seedling, etc., a grower produces a plant, that grower has engaged in primary agriculture. However, if a grower purchases a plant from an independent grower, to determine whether merely watering the plant is sufficient to constitute primary (or secondary) agriculture depends, *inter alia*, upon whether watering that plant is intended to preserve it for resale or to produce growth.[13] Thus, both the activity and the product are relevant in determining whether the exemption applies.

**B. Does the Relevant Activity Constitute Primary Agriculture or Secondary Agriculture?**

Defendant's theory of the case relies on this court finding that the relevant activity constitutes primary agriculture, secondary agriculture, or both. An analysis of each of the relevant work categories demonstrates that defendant did not meet its burden of establishing any of these alternatives with respect to two categories of work. This fail-

ure is sufficient to defeat the exemption in its entirety.

**1. *Work performed on plants obtained by defendant from independent growers*** [14]

■ Defendant asserts that the work performed with respect to the plants obtained from independent Florida growers ("Florida foliage") is exempt as primary agriculture. Defendant reasons that, because employees perform horticultural activities on a substantial portion of the Florida foliage, they have engaged in exempt agricultural activity. Defendant further contends that nearly all of the Florida foliage remains at the greenhouse from two to eight weeks and is (1) inspected for insects and disease, (2) rejuvenated from any damage cause during shipment, and (3) subjected to acclimatization before it is resold.

■ Plaintiffs counter that agricultural activity performed on plants shipped from other growers is not agriculture within the meaning of the statute. In support of their position, plaintiffs direct the court to a United States Department of Labor Opinion ("Labor Opinion") addressing the care of plants obtained from other growers within the context of the definition of agriculture. The opinion states that, in determining whether the activities of particular employees in connection with agricultural or horticultural commodities purchased from independent growers constitute primary agriculture, "it is necessary to consider all the facts and circumstances including whether the operations performed on the plants are calculated to produce growth to maturity or substantial maturity, or whether the operations are designed to care for or preserve the plants while they are on the grower's premises."

13. Where such a plant was watered merely to preserve that plant for resale then any growth that occurred in the plant would be incidental and no different from the activity of a broker.

14. Cover purchases are not included in this category and do not affect the availability of the exemption. *Wirtz v. Jackson & Perkins Co.,* 312 F.2d 48, 51 (2d Cir.1963). However, defendant has not established that every alleged cover purchase was, in fact, due to crop failure. There is credible testimony that such purchases were

made because defendant oversold its stock. For example, defendant stated at trial that it occasionally "ran out" of dish gardens and immediately resold them upon their arrival at MAG. Because defendant has the burden to establish which purchases were a result of crop failure and which were not and failed to do so, the exemption is lost as to all work performed on the Florida foliage allegedly purchased to cover crop failure.

Plaintiffs Post–Trial Brief, Appendix I. In an opinion addressing cross motions for summary judgment in this case, Judge Norgle, adopted this position in light of its reasonableness and relevance to the instant case "regardless of whether the court owe[d] this view any deference." *Adkins v. Mid–American Growers,* 831 F.Supp. 642, 646 and n. 2. For the same reasons this court finds this position set forth in the Labor Opinion an appropriate source of guidance in determining the merits of this case.[15] Moreover, the court adopts additional text from the Labor Opinion which states that, other factors to be considered are:

1) the stage of development of the plant at the time it is obtained, i.e., whether it is immature, substantially mature or fully matured; and

2) the nature and purpose of the operations performed on the plant, and

3) the length of time the plant is retained from the time it is obtained to the time of sale or other disposition and the stage of development at that time.

Plaintiffs Post–Trial Brief, Appendix I.

The testimony in this case regarding the employees' interaction with the Florida foliage was extensive. Kevin Corrigan, a grower/manager, testified that plants were sold within as few as twenty-four hours or as many as several months. Some plants are unloaded and shipped out immediately upon arrival. Some plants are fed before being shipped out. However, the grower generally has the discretion to feed or not to feed the plants. This fact alone establishes the hollow core of defendant's claim that the acclimatization process was both policy and *practice.*

Corrigan also testified that growers never tried to stop a plant from being pulled[16] for lack of acclimatization. Indeed, the production manager, John Zimmer, corroborated that the policy of giving customers the "best quality" plants overrode any policy of taking plants that had been there longer before more recently shipped ones. MAG assumed without a basis in fact that acclimated plants were always of better quality than unacclimated plants. Moreover, Patricia Bridgeforth, a general laborer who was supervised by Zimmer, testified that she was never instructed to pull the oldest dish gardens first when filling orders.

Hope Marroquin, a general laborer who pulled orders, testified that she would sometimes pull the newer dish gardens, that is, some orders were pulled from the front rather than the back.[17] She also testified that dish gardens were watered when assembled but only if they were there for a week or two would they be fertilized and treated for root rot.

Lois Steil, a grower/manager, informed the court that ten inch plants would have grown a maximum of two years in Florida before being shipped to defendant. These plants are big but immature, however, because their leaves are thin and not fully formed. Such plants would need approximately two weeks for proper acclimatization. Steil claims that she can tell by looking at a plant the conditions under which it has been grown. She judges maturity by its sturdiness; a plant is flimsy when branches are at acute angles to trunk because of lack or space, its leaves may also be stressed.

---

15. Defendant strongly objects to the court's adoption of the principles set forth in the Labor Opinion. First defendant contends that plaintiff has not laid proper foundation for the introduction of the opinion. Second, defendant argues that labor opinions are typically issued in response to a specific factual scenario and thus are of limited applicability. Although, plaintiffs failed to lay proper foundation for the Labor Opinion, this court may still adopt that opinion in whole or in part for its persuasive value. Furthermore, the text of the opinion upon which the court relies provides a general analysis for determining whether work performed on plants from other growers constitutes agriculture. That analysis is not limited to any particular factual premise.

16. "Pulling [an] order" means that the individual would be instructed to go into the greenhouse and select plants to fulfill a customer request.

17. Defendant's plan of action was to situate the plants so that the newer plants were placed in the front and treated pursuant to the acclimatization process and moved back to make room for each new shipment of plants. Orders would be pulled from the back to allow the newer plants to undergo complete acclimatization.

The court found that all the above testimony was credible because, *inter alia,* defendant did not rebut the testimony with proof that there was an organized and consistent acclimatization process at MAG whereby plants were pulled for resale only after the acclimatization process had been completed. Indeed, all the facts and circumstances indicate that while some of the work performed was calculated to produce growth to maturity or substantial maturity or to acclimate the plants, some work was simply designed to care for or preserve the plants while at MAG until they were resold. Although Joe Cerri, the grower primarily responsible for the Florida foliage, testified that only 10 to 15 floor plants leave the facility within two weeks of arriving at MAG, there was ample testimony that the Florida foliage left the facility in much shorter periods of time and, more important, that there was no system in place to guarantee that this did not occur. Moreover, that the Florida foliage is inspected for damage, disease, and insects when it arrives is inconsequential since not only is this activity not necessarily primary agriculture but some of these plants are immediately resold anyway.

At bottom, all the evidence leads to the conclusion that, while acclimatization of the Florida foliage may have been the goal at MAG, the practice was different. Some plants went out as soon as they were loaded, there was no method of monitoring how long plants stayed, and there is credible testimony that not all the foliage was subject to acclimatization. Although the proposition that a systematic program of acclimatization constitutes primary or secondary agriculture is compelling, this Court does not decide that today because it finds that no such program existed at MAG.[18] The court is therefore compelled to conclude that defendant has failed to establish that the employees's work performed with respect to the Florida foliage is not exempt under the FLSA.

Defendant responds that between 1986 and 1991 the Florida foliage constituted on average two percent (2%) of its total sales. Moreover, defendant claims that the plants occupy a relatively insignificant portion of the greenhouse. These arguments form the basis of defendant's contention that, under the *de minimis* doctrine, the nonexempt work made plain by the evidence, does not defeat the exemption.

To be sure, some Florida foliage underwent the proper acclimatization process and were not resold immediately upon arrival or soon thereafter. However, it was defendant's burden to establish entitlement to the exemption by demonstrating that *all* of its employees' work constitutes either primary or secondary agriculture. The evidence is clear, however, that a significant, though not substantial, portion of their activity is neither. Moreover, as this court determined earlier, the doctrine of *de minimis* has little if any application in the context of the FLSA exemptions.[19] Furthermore, the court finds that, if applied, the *de minimis* doctrine

18. For example, according to Lois Steil's testimony, it would take a ten inch plant from Florida approximately two weeks to undergo proper acclimatization. Thus, if defendant had implemented a system whereby it was its policy and practice keep such plants for two weeks and subject them to the acclimatization process prior to resale then it is likely that it could avail itself of the exemption with respect to the work performed on those plants.

19. Another factor to be considered in the instant case is the fact that defendant's relationship with the Florida growers is entirely independent. That is, the Florida growers are not contract growers to whom defendant supplies seed, labor, resources, etc. Under those conditions, the exemption would likely apply. However, where the grower from whom an employer purchases agricultural commodities is an independent grower, courts have expressly held that this fact

results in a loss of the exemption. *See, e.g., Wirtz v. Osceola Farms Company,* 372 F.2d 584 (1967) (transportation of sugar cane from fields of independent growers to defendant's mill is not primary or secondary agriculture ); *Chapman v. Durkin,* 214 F.2d 360 (5th Cir.1954), *cert. denied,* 348 U.S. 897, 75 S.Ct. 218, 99 L.Ed. 704 (transportation of fruit from farms of independent growers by employees of a fruit company not harvesting and thus nonexempt); *Calaf v. Gonzalez,* 127 F.2d 934 (1st Cir.1942) (transportation from employer's own farm to its physically separate mill held to be nonexempt as incident to milling rather than farming); *Bowie v. Gonzalez,* 117 F.2d 11 (1st Cir.1941) (transportation of sugar cane from fields of independent growers to the mill not within the exemption). Here, the issue is not the transportation of plants shipped from independent growers but rather the processing (through acclimatization) before sale.

would not preserve the availability of the exemption since defendant has failed to convincingly demonstrate that the percentage of work on the Florida foliage and other nonexempt work, when aggregated, is so minuscule as to be *de minimis*. Accordingly, plaintiffs are entitled to overtime compensation for any workweeks in which they performed work on or relating to plants purchased from independent growers.[20]

### 2. Work performed relating to "hard goods"

Defendant claims that work performed relating to hard goods is exempt as secondary agriculture. Specifically, defendant contends that, when "all the facts surrounding [the] operation" are considered, it is apparent that the small irregular sales of hard goods are merely incidental to the overall farming operations at MAG. Indeed, defendant concedes that it sometimes sells hard goods to smaller neighboring greenhouses and to its customers as a courtesy. From 1986 to 1991, defendant sold between $ 3,000 to $ 9,000 worth of hard goods. These sales totaled approximately eight one-hundredths of one percent (.08%) of defendants' total sales during that period. The hard goods were sometimes sold at cost.

As established above, in order for the broader secondary agricultural activity to fall within the scope of the exemption, it must be (1) performed either by a farmer or on a farm and (2) incidental to or in conjunction with such farming operations. There is no dispute that the relevant activity meets the first criterion. Rather the question is whether the sale of hard goods is incidental to or in conjunction with defendant's farming operations.

In *Farmers Reservoir*, the Court concluded that work performed by employees of a water supply company cooperatively owned by a group of farmers was not exempt as secondary agricultural work even though the work was incidental to agriculture because it was not performed either by farmers or on a farm. *Farmers Reservoir & Irrigation Co.,*

337 U.S. at 767, 69 S.Ct. at 1281. The Court reasoned that the employees' work was not performed by farmers, although the company that employed them was wholly owned by farmers, because the company had been established as an independent entity to supply water to farmers—an activity that the court characterized as self-contained and separate from the farmers' farming activities. The Court considered that whether the farming operations were "separately organized as an independent productive activity." *Id.* at 761, 69 S.Ct. at 1278. The Court also reasoned that the employees' work was not exempt as work performed on a farm because the employees worked only on waterways owned by the company and never worked on the farms to which the company supplied water. *Id.* at 767–769, 69 S.Ct. at 1281.

In *Maneja v. Waialua Agricultural Co.,* 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040 (1955), the Court concluded that certain employees of a corporate sugar plantation were exempt from the FLSA's wage and hour provisions while others were not exempt even though, unlike the *Farmers Reservoir* employees, all of the *Waialua* employees worked both for a farmer and on a farm. The Court held that employees who operated the farm's railroad to transport work crews, equipment, and supplies to and from the fields and sugar cane to the processing plant and those who repaired the mechanical implements used in farming were exempt because their tasks were incidental to the farm's primary agricultural activities. Employees who worked in the corporation's sugar processing plant and who maintained the company town were not exempt because their jobs were not incidental to the farm's primary agricultural activities. *Waialua Agricultural Co.,* at 262–263, 75 S.Ct. at 724–725.

*Waialua* effectively narrowed the second prong of the test for secondary agricultural activity. For secondary agricultural activity to be exempt it had to be performed by a farmer or on a farm *and* it had to be incidental to the farming operations per-

---

**20.** This holding extends to all employees who performed tasks pertaining to the procurement, sale, storage, and maintenance of the Florida foliage such as truck drivers and warehousing workers.

formed either by the farmer for whom it was done or on the farm where it was done. *Waialua* also instructs courts to look at all the facts surrounding the operation. *Id.* at 264, 75 S.Ct. at 725. Further, *Waialua* sets forth an seven-factor test to determine whether the practices in question "relate to the farmer's own farming operations and not the farming operations of other and [are] subordinate to such operations." *Id.* at 263, 75 S.Ct. at 725. The relevant factors are: (1) the size of the ordinary farming operations relative to the challenged activities; (2) the type of product resulting from the operation in question (are they agricultural commodities?); (3) the investment in the challenged operation relative the ordinary farming activities; (4) the time spent performing the challenged activity relative to ordinary farming; (5) the extent to which ordinary farmworkers engaged in the challenged activity; (6) the degree of separation by the employer between the various operations; and (7) the degree of industrialization. *Id.* at 264–65, 75 S.Ct. at 725–26.

■ Here, defendant's sale of hard goods is not a separate operation but rather a service to its customers. Moreover, it constitutes a negligible portion of defendant's business and investment of defendant's resources relative to defendant's its farming operations. The products sold are either horticultural products or relate to horticulture. Finally, the same employees who perform agricultural work at the greenhouse perform work in relation to the hard goods. Accordingly, under the *Waialua* test, and the definition of agriculture set forth in *Farmers Reservoir*, the court concludes that work performed with respect to hard goods does not defeat the exemption.

### 3. Work Performed at the Van Wingerden Residence

Van Wingerden lives in a home located about 400 to 500 feet from the greenhouse. The house was built in 1977. Van Wingerden built an addition to the house in 1991 or early 1992, At various times, certain MAG employees would perform tasks at the Van Wingerden house or its perimeter. One employee in particular, Porfirio Ortiz ("Ortiz"),

performed tasks at the house with relative frequency. Ortiz mowed the lawn and watered plants at the Van Wingerden house. On at least two occasions, Ortiz took chairs from around the swimming pool down into the basement of Wingerden's house. In addition, Ortiz cleaned up some of the construction after Van Wingerden built an addition to his house.

■ Although Van Wingerden alleges that part of mowing around the house was for pest control and to maintain the appearance of house where he sometimes entertained customers, the court finds that defendant did not establish a sufficient nexus between the upkeep of the Van Wingerden house and the defendant's farming operations. Nor did defendant establish that any farming operations took place at the Van Wingerden home except occasional meetings with clients and employees.

When asked whether employees other than Ortiz worked at the Van Wingerden house, Van Wingerden testified that John Zimmer would send laborers over. These laborers would sometimes wash Van Wingerden's car, in addition to performing other menial tasks. Van Wingerden kept three to four horses at the house from 1988 to 1991. These horses were not used in the greenhouse operation. Some employees helped bring in the hay for feeding the horses. Kevin Esker testified that he, along with another employee, would unload and store hay for the horses. In addition, the maintenance people from the greenhouse would perform mechanic work and/or routine maintenance on Van Wingerden's personal car and the personal car of his wife. Also, Van Wingerden's wife has a friend who works at the greenhouse who sometimes served as a babysitter for the Van Wingerdens in lieu of working at the greenhouse.

None of the activity above can be considered primary or secondary agriculture in its broadest definition within the meaning of the statute. Defendant offers little argument to justify why the exemption should apply to such activity except its assertion that "in a traditional view of farming operations, mowing the lawn at the farmhouse would [ ] be an activity ordinarily expected to be performed

by farmhands." The court agrees, however, under the FLSA, the farmhands would be entitled to overtime compensation for such activity if other overtime prerequisites were met. Moreover, the evidence in this case demonstrates that more than occasional lawnmowing was performed at the Van Wingerden home. The court thus finds that, because none of the activity described above qualifies as agriculture, by any definition, the plaintiffs performance of such tasks results in a loss of the exemption.

WHEREFORE, for the reasons stated in this memorandum opinion, plaintiffs are entitled to compensation at time and one-half for hours worked over forty during any workweek in which plaintiffs performed nonexempt work as defined herein. The parties are instructed to appear for a status hearing to discuss the issue of the determination of damages on May 15, 1997.